## STATE OF NORTH DAKOTA, Respondent, v. RAY POTTER, Appellant.

(233 N. W. 650.)

Opinion filed December 5, 1930.

*Alfred Zuger, Scott Cameron,* and *L. H. Connolly,* for appellant.

184

*James Morris,* Attorney General, *John F. Sullivan,* Special Assistant, and *George S. Register,* State's Attorney, for respondent.

BURKE, Ch. J.: This case was first tried in Burleigh county, and the jury failing to agree, the case was thereafter, on the application of the state transferred to McLean county, where after a trial the defendant was convicted of murder in the first degree.

A motion for a new trial was made upon specifications of error, and on the denial of said motion, the defendant appeals from the judgment of conviction, and from the order denying the motion for a new trial. In the specifications of error on appeal, appellant raises one question of error not specified or raised in the motion for a new trial, nor at any time in the proceedings until it is raised on appeal, viz., "That the court erred in granting a change of venue to McLean county, for the reason, that the state failed to make a proper showing to the effect that a fair and impartial jury could not be secured in the county of Burleigh; that the affidavits submitted by the state were to the effect that it was impossible to obtain a jury in the fourth judicial district, being the district in which the county of McLean is located." The affidavits on the part of the state with one exception, do allege that it is impossible to obtain a jury in the fourth judicial district, and McLean county is in the fourth judicial district, but all the affidavits refer more specifically to Burleigh county, and to the city of

Bismarck, the county and city in which the defendant and Oliver Webb, the deceased, lived for many years and in which they were well known. In the affidavit of the state's attorney that part specifying the fourth judicial district is stricken out; otherwise, it is the same as the other affidavits filed on the part of the state. All the affidavits for the state allege in substance, that the defendant, Ray Potter, and the deceased Oliver Webb were residents of Burleigh county for many years, were personally and widely acquainted with a great number of persons residing in Burleigh county who are subject to call as jurors; that since the date of the killing a keen public interest has been taken in the facts and circumstances, and the public interest in said killing has been evidenced by general conversations and expressions of opinion as to the guilt or innocence of the defendant, almost continuously since said killing and up to the date hereof; that in the December, 1928, term of the district court of Burleigh county, said defendant was tried and during the trial of said action which consumed, with adjournments, several weeks, the public interest was further inspired and accentuated by the daily newspapers at Bismarck and Mandan, both of which papers have a very wide circulation, and which said papers carried daily, as leading articles, supplemented with large headlines the report of the trial, the evidence, and all the facts and circumstances surrounding the same; that the wide dissemination of information concerning the killing and the testimony produced at the former trial the newspaper discussion of the case, the public interest it has inspired and the general discussion of said matter is such that this affiant verily believes that it would be impossible to obtain a jury in Burleigh county that had not formed an opinion as to the guilt or innocence of the defendant, such as would disqualify them as jurors, and this affiant states to the court under oath that in his judgment the ends of justice demand that the place of trial be changed from Burleigh county to some other county in the state of North Dakota where the cause for change complained of does not exist.

The counter affidavit of Scott Cameron, attorney for the defendant, states in substance "that he is informed and believes, that the persons who signed affidavits in support of the application, are all residents of the city of Bismarck, who are personally acquainted with the deceased, his relatives and the defendant, and that said affidavits do not

truly express the state of mind of the majority of the prospective jurors in said county; that the story of the trial was published generally through the medium of the associated press news service, was contained in all of the daily papers published in the state of North Dakota and of Minneapolis and St. Paul, and the objection raised to a trial in Burleigh county could be made with practically the same showing in any other county in the state, that at the first trial a jury was secured without exhausting the peremptory challenges of either party." This is followed by a large number of affidavits to the effect that a fair trial could be had in Burleigh county. The affidavits for both the state and the defendant are largely conclusions, but no objection was made to them upon that ground. Apparently, appellant was of the opinion that the affidavits for the state made a prima facie showing for a change of place of trial. This is apparent from the affidavit of the attorney for the defendant to the effect, "that the affidavits of the state do not truly express the state of mind of the majority of the prospective jurors in said county." The inference is, that if the affidavits of the state did truly express the state of mind of the majority of the prospective jurors in said county, that the state would be entitled to a change, but the state is not entitled to a change, for the reason, that these affidavits do not express the true state of mind of the prospective jurors. He therefore asked for time to secure other affidavits stating, "that the defendant has not had an opportunity to interview taxpayers residing in Burleigh county, outside of the city of Bismarck, and believes that if the court so desires, affidavits similar to those attached hereto can be obtained from an unlimited number of responsible taxpayers in Burleigh county." Time was given to the appellant until the fourth of June, and upon that date he filed additional affidavits all to the same effect that the defendant could have a fair trial· in Burleigh county. These affidavits of the state and the counter affidavit of the defendant were all submitted to the court, and without any objection upon the part of anyone as to their sufficiency, and upon the theory that if the affidavits of the state were true it was entitled to a change, but if they were not true, a fair trial could be had in Burleigh county. The court after considering the affidavits was satisfied that a fair trial could not be had in the county

of Burleigh, but could be had in McLean county, and accordingly changed the place of trial to McLean county.

The memorandum opinion of the judge before whom the motion was heard states, in part "The above entitled matter came on to be heard at chambers in the court house at Bismarck on May 31, 1929, . . . after consideration of the affidavits submitted on behalf of the state and on behalf of the defendant, the defendant being given further time to file affidavits to June 4, 1929. . . . The defendant, Ray Potter, and the deceased, Oliver Webb, were residents of Burleigh county for many years, and personally and widely acquainted with numbers of persons residing in Burleigh county. The trial of this case was held in Burleigh county during the month of December, 1928, resulting in a disagreement by a Burleigh county jury. By reason of certain incidents occurring at the trial from the commencement thereof to the conclusion, the same occupied a period of twenty days; during all of which said time there appears to have been extended publicity on the matter of the trial and the matters of evidence offered by the respective parties, which publicity appears to have been intensified throughout the city of Bismarck and Burleigh county; and that by reason of the length of the trial, and the public interest therein, and the publicity with reference to the same, many electors and citizens have formed opinions on the merits of the cause of the state and the defendant. Investigation has determined that the interest in the trial and the facts involved have permeated all classes of people residing in Bismarck . . . and this condition does not alone exist in the city of Bismarck, but throughout Burleigh county. . . . In view of the wide and extended acquaintance of the defendant and the deceased, Oliver Webb, and the keen and intense public interest taken in the transactions involved, and the fact of a former trial extending over a great many days resulting in much publicity through the press and private conversation, and the fact that the jury selected was unable to agree. . . . And the court is satisfied that it will promote the ends of justice to change the place of trial of this cause. The court believes that McLean county is the most convenient, opportune and satisfactory place of trial to be selected; therefore McLean county will be selected as the proper county to which the trial of said action will be changed."

Thereafter, and on the first day of July, 1929, the court made its order reciting most of the facts stated in the memorandum opinion, and on the 12th day of July, 1929, the state and the defendant through their attorneys stipulated that the court having ordered the trial of said action Washburn, McLean county. "It is hereby stipulated, and agreed by and between Scott Cameron and L. H. Connelly, attorneys for the defendant, and John F. Sullivan and Geo. Register, attorneys for the plaintiff, that all the original records on file in the office of the district court of Burleigh county, North Dakota, in said action may be transferred to the clerk of the district court of McLean county, North Dakota, for the purpose of the trial of said action, in lieu of certified copies, except, the original undertaking which is to be retained by the clerk of the district court of Burleigh county and a certified copy thereof filed with the record."

When the case was called for trial on the 15th day of July, 1929, after a roll call of the jury by the clerk, and a general admonition to the jury by the trial judge the following proceedings were had. The court, "Are you ready for trial in this case?" Mr. Sullivan, "The state is ready." Mr. Cameron, "The defense is ready." The court, "You may call a jury." The jury was then called, selected in reasonable time and without either party exhausting his peremptory challenges, and the trial was had without any question being raised on the matter of change of venue, nor was it raised in the specifications of error for new trial before the trial judge.

There is no constitutional right or question of jurisdiction involved. Since the decision in Barry v. Truax, 13 N. D. 131, 65 L.R.A. 762, 112 Am. St. Rep. 662, 99 N. W. 769, 3 Ann. Cas. 191, it is the well settled law of this state, that the state has the same right to apply for removal of a criminal action to another county that the defendant has, and that if the court is satisfied that it will promote the ends of justice he may. order a removal upon the same terms and to the same extent as are provided for the removal on the application of the defendant.

"The granting or denying of an application duly made for a change of the place of trial of an action on the ground that an impartial trial cannot be had in the county where the action is pending, is a matter within the sound discretion of the court to which the applica-

tion is made, and its rulings will not be disturbed except for an abuse of discretion. Ross v. Hanchett, 52 Wis. 491, 9 N. W. 624; Giese v. Schultz, 60 Wis. 449, 19 N. W. 447; State v. Hall, 16 S. D. 6, 65 L.R.A. 151, 91 N. W. 325; Territory v. Egan, 3 Dak. 119, 13 N. W. 568; People v. Webb, 1 Hill, 42; Com. v. Balph, 111 Pa. 365, 3 Atl. 220; Com. v. Delamater, 145 Pa. 210, 22 Atl. 1098; People v. Peterson, 93 Mich. 27, 52 N. W. 1039; People v. Fuhrmann, 103 Mich. 593, 61 N. W. 865; People v. Vermilyea, 7 Cow. 137; State v. Winchester, 19 N. D. 756, 122 N. W. 1111."

"Objections to granting or refusing to grant a motion for change of venue will not generally be considered when made for the first time on appeal." 17 C. J. page 52, § 3329 and the many cases cited.

It is also well settled in this state, that when there has been a motion for a new trial, only errors specified and considered on the motion for a new trial may be considered on appeal. State v. Krantz, 55 N. D. 683, 215 N. W. 157; State v. Glass, 29 N. D. 629, 151 N. W. 229; State v. Reilly, 25 N. D. 339, 141 N. W. 720; State v. Empting, 21 N. D. 128, 128 N. W. 1119; State v. Harbour, 27 S. D. 42, 129 N. W. 565.

It is not necessary to pass upon the question of the sufficiency of the affidavits for a change of venue, as it clearly appears from the record that the question was not raised until it was raised for the first time in this court. It should have been raised in the motion for a new trial under subdivision 5, § 10917, Comp. Laws 1913.

On the evening of the homicide Oliver Webb, Donald Snyder, Mike Bartley and Mrs. Snyder were at the defendant's home and there was some talk about the defendant, Oliver Webb and Mike Bartley going hunting on that Saturday night, or on Sunday morning.

About nine o'clock Mrs. Potter said she wanted to go to the show and Oliver Webb took her and Mrs. Snyder down town, leaving Mrs. Potter near her sister's apartment, and returning in about fifteen minutes, when there was more talk about the hunting trip. Potter's gun was dirty from the last hunt and Snyder said, he could have his gun as he was not going hunting. With this understanding, Webb drove the Snyders home, got his gun which was at Snyder's place and also Snyder's gun, both guns having been cleaned and put in cases, were put in the Oliver Webb car for the hunting trip, the Snyder gun for

the use of Potter. Webb returned to Potters and a little later left with Bartley, remaining at Bartley's place until about eleven o'clock at night. After Webb and Bartley left, Potter called someone on the telephone, asking if Mary was there. (Mary is Mrs. Potter's name.) He then went to the home of Bruce Belk, from there to the Roger's home and from there to the apartment of his sister-in-law, a Mrs. Krueger. After some conversation with Potter, Mrs. Krueger and Mrs. Potter, Potter and his wife walked back to the Potter home. In about fifteen minutes Oliver Webb came in, and after some conversation about some sandwiches Mrs. Potter and Oliver Webb got in the Webb car, drove away and were gone about fifteen minutes and on returning drove up in front of the Potter house, next to the boulevard. Mrs. Potter got out of the car and just as Oliver Webb was getting out there was a report of a gun. Oliver Webb was shot in the abdomen, and the defendant was standing on the sidewalk next to the boulevard with his gun in his hand. It is conceded that Webb was killed by the discharge of the defendant's gun. The evidence is in substance as follows:

Donald Snyder, a witness for the state, testifying as to what took place on the evening of the homicide, said: "About 8:30 in the evening, my wife, Oliver Webb, Susie Bahm and I went to the Potter home. Potter talked about his gun and how dirty it was. I told him at that time that if he did not want to take it he could take mine, mine was all clean. I cleaned both Oliver's and mine before that. He asked me what kind of a gun I had, and I said just like Oliver's. At that time Mrs. Potter and Mr. Bartley were at the Potter home. About ten or fifteen minutes after we got there my wife, Oliver and Mrs. Potter drove downtown. Mrs. Potter said she was going to a show. In about ten or fifteen minutes my wife and Oliver came back. They were talking about going hunting and wanted Mike Bartley to go along but it was not settled whether they were to go that night or the next morning. I noticed that the Potter gun was dirty and had mud on it. When I left the Potter home I think it was understood that I would put my gun in Oliver's car for him, and when we got home we put both guns in Oliver's car. I was not going hunting. Both guns were put in cases. Oliver took me home and only stayed a short time."

Ruben Almquist was with the hunting party the Sunday before and

he testified: "Snyder and Webb and I took our guns apart and put them in cases when we were done hunting. Potter's gun was empty, the shells were taken out. He didn't have a case to put the gun in, and put it in the car as it was." Ques. "Are you sure the shells were taken out?" Ans. "Yes, because I watched him before he put the gun in the car. He repeated it three times."

This testimony which is undisputed shows that after the party was through hunting on the Sunday previous to the homicide, that the Potter gun was unloaded, that is, the shells were taken out of it, and on the evening of the homicide the gun had not been cleaned from the last hunt, that Potter called attention to his gun, and Snyder who was not going hunting offered to let him have his gun, and upon arriving at his home he put his gun together with Oliver Webb's gun in the Oliver Webb car.

Mr. Bartley who was present at the Potter home testified: "Mr. Snyder said, he didn't feel like going hunting and offered to let Mr. Potter use his gun, as Potter's gun was dirty, and he did not want to take the time to clean it. After Oliver Webb took the Snyders home and returned to the Potter home they were still debating on whether to go hunting or not. They had already got some sausage and were talking about cooking it. I left about ten o'clock and Mr. Webb went with me to my place. Oliver Webb left my place about eleven o'clock. There was no definite arrangement made about going hunting before I left the Potter home. About eleven-thirty I called the Potter home and talked to a party I inferred was Mr. Potter. A man's voice answered the phone, I said, what did you fellows decide about going hunting tonight or in the morning? He said, 'I don't think so.' I said, what's the trouble Ray? What caused you to change your mind? He said, 'I guess everybody got pretty well stewed and the party broke up.'" This telephone conversation is corroborated by Susie Bahm who testified that, "Mr. Potter answered the phone and said that the party had broken up and he was going to bed. That was after the car had driven away" (meaning the car in which Mrs. Potter took Oliver Webb to the hospital).

Mrs. Donald Snyder testified that, It was about eight-thirty when she, her husband, Oliver Webb and Susie Bahm arrived at the Potter home. "Mrs. Potter said she was going to a show with her sister,

and Oliver Webb drove Mrs. Potter and me down town about nine o'clock. We stopped just between the post office and the Hoskins' Building on Broadway at the alley. Mrs. Potter got out and started through the alley. Her sister lives over Hoskins or Quanrud Brink and Reibold. Before she left the house she stated that she was going to the show with her sister. I sat in the car and Oliver ran across the street and got the laces for my shoes, then we got some sausage and drove back to the Potter home. Mr. Potter, my husband, and Mr. Bartley were there. In about ten minutes Oliver Webb drove me and my husband home."

Hallie Belk testified: "I was at the Potter home about nine o'clock on the evening of the 27th about ten or fifteen minutes at that time. They were talking about going hunting. There were glasses with spoons in them on the table. Just as I was leaving Mr. Potter and I had a drink out of the bottle which Mr. Potter drew out of his hip pocket. I couldn't say whether it was a pint or a half pint bottle. I formed the opinion that they were drinking and apparently put on a little party before their hunting trip. I wouldn't say that they were drunk."

Bruce Belk testified: He lived about three blocks from Mr. Potter and that about "ten o'clock on the evening of the 27th (the evening of the homicide) Potter came to my house. He came to the front door and came in not knocking at the door, and asked me where I was going. I told him, and he said don't let me stop you, and I could tell he was drinking from the way he acted. He wasn't what I would call exactly drunk, but was doing a little wobbling and wasn't walking very straight, talking kind of loud which he does when he is drinking. He took a drink at my place of alcohol mixed with water. He was just outside the door at the time. He didn't leave with our party."

Mrs. Bruce Belk testified that: "He left their place at about ten-thirty, and had been drinking. His tongue was thick, we could understand him but not very well. I have seen him more intoxicated than he was that night. Yes, we and the Potters are close personal, bosom companions. Yes, you bet."

Arlowene Rogers testified that: "It must have been between ten-thirty and eleven o'clock when the defendant came to the home. I

was sleeping on the porch. He came up to the screen door which was fastened on the inside. He stayed a couple of minutes. I could see that he was under the influence of liquor and I asked him where he had been, and he said he didn't know, and I then asked him whom he had been with and he didn't know. I then asked him where he was going and he didn't know. I opened the door and he stumbled out. There are three or four steps to the porch. I didn't see him any more that night. He had an odor of liquor about his person. He was under the influence of liquor. He wasn't what I would call drunk." Witness testified on cross-examination that she was a close friend of the Potters.

Mrs. Wolf testified: "I live in the Quanrud Brink and Reibold Building, known as the Q. B. & R. Building. Mrs. Ray Potter's sister had room·eight in the building and I live in room seven, which adjoins room eight on the same side of the hall with a partition between. I was in my room on the evening of the homicide. Mrs. Krueger had gone out about seven-thirty. Someone came up the back stairs about eight-thirty or a quarter to nine, and went into Mrs. Krueger's room, and someone came up the front stairs and went into Krueger's room. I heard a man's voice and a woman's voice. About ten o'clock Mrs. Krueger came in. After Mrs. Krueger came home someone came up the front stairs and walked to the end of the hall and back and Mrs. Krueger opened her door. This party came back then, I don't know what he said. I heard Mrs. Potter say, 'come on Ray let's go home.' The ·person that was in the hall was the person Mrs. Potter was talking to. I don't know what the man said to Mrs. Krueger, she said, 'he isn't up here,' then Mrs. Potter said, 'come on Ray let's go on home.' The person addressed as Ray did not go in the room, they were out in the hall, they went on down stairs by the front stairs:" Ques. "Then what happened?" Ans. "When I was going out of my room I saw a man come out of Mrs. Krueger's room. He went down the back stairs. I did not know him."

Mrs. Potter testifying as to what occurred on the evening of the homicide said: "Ray came home about eight o'clock in the evening. Oliver Webb came in just before or after he did. I noticed that Ray had been drinking. They were talking of going hunting. They had gone·hunting on several ·occasions, usually on Saturday night or early

Sunday morning. They were drinking. I was given a glass, it was alcohol mixed with hot water. I couldn't say for sure that there was more than one round of drinking. About nine o'clock Oliver Webb, Mrs. Snyder and I went down town. I was going to my sister's. I got out of the car at the front of the post office on Broadway and went up the back way to my sister's apartment in the Quanrud Brink & Reibold Building. I opened the door and went into my sister's apartment. There was no one there. I had made arrangements to go to the show with my sister at noon, but when I got there my sister was gone to the show. I stayed there until she came home around ten o'clock or ten-fifteen. I was there about an hour before she came, reading a new Red Book. I first saw Ray again that evening at my sister's apartment around about ten-thirty. He came up the hall. My sister opened the door, he was standing there close to the door. I could tell he was drunk. He wasn't standing right on his feet and he was talking loud. I know he was good and drunk. He said he was looking for 'Dooley,' 'Dooley' was a nickname for Webb." Ques. "Did he come into the room at all?" Ans. "He was standing right in front of the door. I talked to him for a while and then I put my coat and hat on and went down the hall with him. We went down to the Hoskins' corner and then east, four blocks east and then five blocks north to our home. He walked very unsteady. When we got in the house he sat down on the duofold, slumped down and didn't seem to know where he was. About fifteen or twenty minutes after we got home Oliver Webb came in. He never rapped at our house, he just walked in. Mr. Potter did not talk to him, I think he called him some name, a drunken fool or something. Oliver wanted some hot sandwiches. I told him, I would make some at the house for him. He said, no, he wanted to go down town and get some hot sandwiches. When I saw that he was going I wasn't going to stay. Webb had been drinking, his face was flushed and red. I went with him, because I wanted him to come back to the house. We went down to my sister's. I wanted to get my gloves that were left at my sister's. I had them there and when I went home with Ray I noticed I didn't have my gloves. Oliver went with me to my sister's room. I asked him to go. We stayed just a few minutes, maybe five or ten. Oliver kept talking about sandwiches, and I kept telling him I would make them at home. We drove home without stopping, right up

in front of our house on Eighth street, I got out first, and I saw Ray coming out of the house. He was carrying a gun and boots. The gun was under his arm and the boots on the other arm. He was not walking steady. I didn't see the gun I heard the report. I did not see the flash of the gun the next I heard Oliver, he was lying down. The first thing I can remember was going into the house. I did not hear Ray say anything. I did not hear him make any statement, or say, 'you can't pull anything of that kind and get away with it,' nor anything of that import. I did not hear him call or state to anybody or address anybody as, a son of a bitch. I did not hear him say, 'go into the house you son of a bitch, or I will kill you too.' I got a hold of Mr. Potter and pulled him in the house with me. I don't know when I got the gun in my hands. I remembered it first when I went upstairs to wake Henry. I went to wake Henry to take Oliver to the hospital. I took the gun and put it in the other bedroom on the floor. I don't know why I did it. I came downstairs, Ray was sitting on a chair. I told him to come with me and help take Oliver to the hospital, but I got no response. I did not say to Ray, 'you know Ray I didn't do it.' Ray did not say, 'I don't care if I do go to jail.' I did not hear him say anything of the kind. He just slumped down on a chair. I didn't notice whether he had the boots on his arm or not. I went out to Oliver. He was lying outside by the car, in just a minute Henry came. I tried to put Oliver in the car. I went back in the house again to see if Ray wouldn't come and help us. I asked him again to come out, and told him I was going to take Oliver to the hospital. I got no response from him. Two gentlemen came up the street Mr. Rigler and Mr. Thal they helped, they lifted Oliver into the car. Oliver said, 'Mary, I am shot.' He always called me Mary. I went back to try and get Ray to go to the hospital, but got no response from him. I came back and Henry drove the car to the hospital. Oliver kept saying, 'my God, my God, my side hurts.' He said, 'Mary, help me.' He said, 'I am dying.' He said, 'Mary, it was an accident.'" On cross-examination Mrs. Potter said: "I told Mr. Webb (Oliver's father) I did not know how it happened. I did not see Oliver when he was shot. I imagine he was getting out of the car, because he was coming in the house. I do not remember, that I testified at the former trial, that I told Mr. Webb that Oliver was in the car."

Louis E. Hankins witness for the state testified: that he was a soldier at Fort Lincoln; that on the night of the homicide he had gone to a show at the Capitol Theatre, accompanied by Linda Clausnitzer. They left the theatre about eleven o'clock for Miss Clausnitzer's home, walking by the house and a block north and then crossed the street, where they stopped, about a block from the scene of the homicide and on the same street. "Directly after the shot, I heard a man's voice say, 'you won't pull that stuff and get away with it.' He said, 'you go in the house or I will kill you too, you son of a bitch.' I saw a car, it looked like a man and a woman between the house and the car. I saw what looked like a man lying down on the side of the car, at the edge of the gutter. He was groaning. He said, 'call the doctor Mary, I am shot, take me to the hospital.' The man and the woman went into the house. Miss Clausnitzer was with me at the time. I don't know if the moon was shining or not, it wasn't dark, but it wasn't so light either. I said to the young lady, 'someone must be shot.' The man who was standing up was about half way between the house and the car. The woman was between the man and the car facing the house."

Linda Clausnitzer testified: "I live at the Rigler home. The Potter house is the last house on the north end of the block and the Rigler house was the last house on the south end of the block. I was at the show with Ellie Hankins. While we were standing talking I heard a shot, and immediately after the shot I heard a man's voice say, 'Where in hell have you been all this time?' Nothing was said before the firing of the shot. He then called her, 'A God damn son of a bitch.' It was a man's voice. Then she said, 'please leave me alone Dad, please dad, leave me alone.' I think they were standing just about on the sidewalk. I heard a man's voice saying, 'please Mary, help me, I am dying, take me to the hospital.' He looked like he was getting out of the car when the shot was fired, he fell right next to the car. He kept saying all the time I was there, 'Jesus and God,' and things like that. The other two went in the house at the same time." Ques. "Did the man at any time go out to the car?" Ans. "No he did not." Ques. "Did he at any time go farther than the place where he was when the shot was fired?" Ans. "No he didn't, he went into the house. I could not see the gun. I do not remember whether it was a dark or a moon light night. It was rather a dark night. When I came to the

house Mr. Rigler asked me if I knew where the shot was? I told him yes, and he went up there, right up to where the car was."

Charles Rigler testified: "The girl (Linda Clausnitzer) came in excited. The Potter house is right in the same block on the other corner, on the same side of the street. I went right up there my son-in-law, Mr. Thal, followed. I seen a man lying down at the side of the car. I heard the voice of the man that got hurt saying, he wanted a doctor, he was dying. When I got there the Potter boy was in the car. In a minute Mrs. Potter came out. The man was lying on the pavement against the car on the side of the curb. We picked him up and put him into the car. Mrs. Potter got in and drove off with the boy." This testimony is corroborated by Alfred A. Thal.

P. B. Webb, father of Oliver, testified, that he was called and went at once to .the hospital, and Oliver said to him, "Am I going to die?" I told him I was afraid he was. I asked him how it happened? He said just the one word, 'accident.' "

Oliver died that night. At the post-mortem examination eleven buck shot were taken out of his abdomen, and his death was caused by the gun shot wound.

Susie Bahm testified: "I was living at the Potter home on October 27th. I was in my room upstairs. I recognized Mr. Potter telephoning, he asked if Mary was there. He didn't say anything more, he hung up. When I came downstairs after the house was quiet it was ten minutes after ten. There was nobody in the house at that time. After that I went back upstairs and went to bed. I next heard someone come upstairs there was talking, and I heard Mrs. Potter's voice, she went into the boys' bedroom, called Henry, then came into my room stooped down got up again, and went out. When she went out I got up and listened. I was going to see what she put under my bed. There was a shot gun there. Yes, it looked like this one (exhibit A.) It was rather a dirty gun, it had the leather at the end of it just like this one. Then I heard Mr. and Mrs. Potter talking downstairs. Mrs. Potter repeated several times, she said, 'Ray you know I didn't Ray, you know I didn't,' and just as she was going out Mr. Potter said: 'I don't care if I have to go to jail.' Mrs. Potter talked in a sort of pleading voice. After that the telephone rang, Mr. Potter answered it, he said, 'the party broke up they were going to bed.' He was going to bed, that was after

the car had driven away. After that I heard somebody knock about three times before the door opened. I heard some talk but I did not hear what was said. The man who came in went to the telephone and talked, it was police Franklin."

Mr. Franklin testified: "I went to the front door of the Potter residence about eleven-forty. I rapped three or four times, Ray Potter came to the door, I asked him if he put in a police call and he said, 'no.' I asked him if I could use the telephone and he said, 'yes.' So far as I knew he looked natural to me I didn't pay particular attention."

The weather bureau records at Bismarck show that from ten to twelve o'clock on that night it was calm, no perceptible wind and moon, nearly full, but cloudy.

Appellant claims that the court erred in permitting the witness Wolf, to testify over the objection of the defendant, that on the 27th of October, 1928, between the hours of eight-thirty p. m. and ten-thirty p. m. that she heard the voice of Mrs. Potter in a room occupied by one Mrs. Krueger, a sister of Mrs. Potter, in conversation with a man whose voice she also heard, it being conceded that Mrs. Potter was in that certain room at the time.

It is the contention of the state that this evidence was introduced for the purpose of showing jealousy as a motive, that Mrs. Potter claimed that she was going to a show with her sister; that sometime after Mrs. Potter left with the avowed purpose of going to a show with her sister, Mr. Potter called someone on the telephone and asked if Mary was there; that it is a reasonable inference that Mr. Potter had doubts about the truth of Mrs. Potter's statement, "that she was going to a show;" that nine-twenty in the evening, the defendant was checking up by telephone on the movements of his wife, with the apparent purpose of determining whether his wife had actually gone to the show as she had stated; that the evidence shows that prior to Mrs. Potter's going to her sister's that there had been but little drinking of intoxicating liquor, and as the telephoning was only a short time after Mrs. Potter left Potter was at that time sober; that his conversation over the phone with witness Bartley about eleven-thirty shows that he was sober at that time; that about ten o'clock Potter started out to look for Mrs. Potter, he called first at the home of Mrs. Bruce Belk, a close friend of the Potters, four blocks from the Potter home. He had been

drinking some, but talked intelligently at that time. From there he went to the Rogers' home, friends of Mrs. Potter, and the witness, Miss Rogers, fixes the time when Potter called at her home between ten-thirty and eleven o'clock and stated, that Potter was under the influence of liquor but wasn't what she would call drunk. Webb and Bartley left Potter's place at ten o'clock, about twenty minutes later Potter appeared at the Belk home staying just a few minutes, then he appeared at the Rogers' home, stayed there only a few minutes, next he was at the Krueger room in the Q. B. & R. Building, fifteen blocks from the Bruce Belk home and ten blocks from his own home, where according to the testimony of Anna Wolf, he arrived between ten and eleven o'clock, walked down to the end of the hall, passing by the room where Mrs. Potter was at the time. That from all the evidence the jury might infer that Potter heard the man's voice in the room as he walked or stood in the hall; that when he got his wife home after his long walk in search of her at different places, and hardly got her home when Webb came and took her away again his jealous rage exceeded all bounds, he got the old dirty gun, loaded it with buckshot waited for Webb and just as he was getting out of the car fired a charge of buckshot into his abdomen; that all of these different acts of the defendant on that night, together with the circumstances form a part or a continuation of the main transaction resulting in the killing of Oliver Webb; that such matters are not so separated or disconnected in point of time or circumstances from the act charged as not to be a part of the continuous transaction, and are therefore a part of the res gestæ of the act.

It is, of course, well settled that every circumstance pointing to motive and intent and opportunity to commit the crime may be shown whether part of the res gestæ or not, but it is equally well settled that, "The circumstances said to have excited the emotion must be shown to have probably become known to the person; because otherwise it could not have affected his emotions." Wigmore, Ev. § 389, p. 711.

In the case of Son v. Territory, 5 Okla. 526, 49 Pac. 923, the court said: "A motive cannot operate to influence until the facts which create the motive exist. The facts upon which a motive is based cannot operate upon the mind until they are known by the party against whom the motive is assigned. . . . It cannot be justly said that

a motive to kill could exist because the party wronged had no knowledge of the facts which would be necessary to create motive." Sasser v. State, 129 Ga. 541, 59 S. E. 255; Cheek v. State, 35 Ind. 492; State v. Shelton, 64 Iowa, 333, 20 N. W. 459; Pence v. Com. 21 Ky. L. Rep. 500, 51 S. W. 801; People v. Morgan, 124 Mich. 527, 83 N. W. 275.

"The rules that evidence tending to show motive or absence of motive on the part of the accused is relevant and admissible, and that a wide latitude in the admission of this kind of evidence is permissible, are applicable." 16 C. J. 547, § 1048.

The conduct of the defendant on the evening of the homicide was certainly admissible. The question of error arises on the objection of appellant to the testimony of Mrs. Wolf, viz., that she overheard a conversation between Mrs. Potter and some man in the Krueger apartment. Mrs. Wolf in her testimony did not give any of the details of the conversation.

If Potter knew that there was a man there, the evidence would be admissible in connection with all the other evidence relating to his conduct on that particular night. Potter did not testify, and there is no direct evidence that he did, or did not know that there was a man in the Krueger room. We think, however, that there is circumstantial evidence from which the jury might well infer that he did know it.

The fact that as soon as Webb and Bartley left the Potter home on the night of the homicide, the defendant called somebody on the phone and inquired if Mary was there, is proof that he was anxious about her and trying to locate her; that almost immediately thereafter he visited some of her intimate friends, and while he does not inquire about her either at the Belk home, or the Rogers home, he could see that she was not at either place, and besides, he naturally would not want to create an impression that he was spying on his wife. When he could not locate her by phone he started out to find her in person. If he was out for a good time, he would have gone to the dance with the other young men whom he met at the Belk home, but instead of going to the dance to enjoy himself, he apparently went directly to the Rogers home and then to the Krueger apartment. Mrs. Wolf heard him walk up the hall, and pass the Krueger apartment. Those in the Krueger apartment heard him, and if they could hear him he

could doubtless hear them. If he did not hear a man's voice in the apartment, and did not know that there was a man there, it would be the most natural thing in the world for him to walk up to and knock at the door, and especially when he had reason to believe that his wife was there. On the other hand, if he heard a man's voice in the room, and did not want any trouble or to embarrass anyone at that time or place he would naturally pass by the door without knocking, and it would be the natural thing for Mrs. Krueger to invite him in, if there was no man there, while if there was a man there whom she did not want Potter to meet, it would be natural for her to do just what she did do. The defendant walked into the Belk home without knocking, he walked directly up to the door of the Rogers home and shook the screen which was hooked on the inside but when he came to his sister's-in-law apartment he walked right by the door which was opened by his sister-in-law, but he was not invited in, nor did he try to go in. As soon as the Potters left, Mrs. Wolf who had gone out in the hall saw the man come out of the Krueger apartment and go down the back stairs.

Mrs. Potter also was apparently anxious to get Potter away. She had spent the whole evening away from home and when Potter appeared in the hall, she put on her coat and hat and said, "Come Ray let's go home." But she hardly got Ray home when Oliver Webb showed up, and on the pretext of getting some hot sandwiches she went with Webb right back to that same room where she had spent the evening. They didn't get any sandwiches and while she couldn't dissuade Webb from going down town to get the sandwiches she had no trouble in persuading him to go back home without the sandwiches. Mrs. Potter's statement relating to the getting of the sandwiches, viz.: "When I saw that he was going, I wasn't going to stay," and again, "I didn't like to have him go down town alone because I wanted him to come back to the house. If he went down alone he would not come back." All of which facts and circumstances, taken in connection with Potter's statement to Mrs. Potter immediately after the shooting, viz., "Where in hell have you been all this time, you can't pull anything like that and get away with it." "Go in the house or I will kill you too," and Mrs. Potter's oft repeated pleading statement, "You know Ray I didn't do it;" are facts and circumstances showing that jealousy was the moving cause of the homicide, and from which the jury might

well infer that Potter knew there was a man in the Krueger apartment as he came up the hall and passed the door. Knowledge of facts may be proved by circumstantial evidence as well as by direct evidence.

Mrs. Potter also testified, "Ray came up the hall. My sister opened the door and he was there, I can't tell how close he was to the door." According to this statement the door was open and there is no evidence to show that it was closed during the conversation when Ray stood in front of it, undoubtedly looking in the room as he talked to Mrs. Krueger. Mrs. Potter does not say that she went outside and talked with him, but that she got her hat and coat, which must have been in the room at the time, and all of which would give the defendant an opportunity to see who was in the room. If they kept the door partly closed so as to prevent the defendant from seeing who were in the room it would excite his suspicion and arouse his jealousy more than if he could see plainly who were in the room. The conduct of Mrs. Krueger and Mrs. Potter and of Potter himself all indicate that there was a reason why Potter did not enter the Krueger room and was not invited in.

Wharton on Homicide, p. 916, states the rule as follows: "In order to establish a motive for the commission of a crime, however, it is essential that the fact upon which the alleged motive is based shall be within the knowledge of the accused . . . though actual knowledge need not be shown, apparent opportunity to become informed being sufficient." It seems clear from this statement of the law that if Potter had apparent opportunity to become informed as to whether there was a man in the Krueger room, then Mrs. Wolf's testimony was admissible, and the question of whether he had such an opportunity was for the jury on all the evidence.

A case very much in point is the case of Marable v. State, 89 Ga. 425, 15 S. E. 453. In this case, "After all the evidence had been introduced and before argument was begun, the defendant moved to rule out all the testimony that deceased had any money, counsel contending that there was no proof that the defendant knew deceased had any money, the theory of the prosecution being that he was killed for his money. The court stated, 'I will let you talk to the jury about whether he knew or not,—whether he knew the facts;' and overruled the motion. Upon this ruling error is assigned, it being insisted that

;there was no evidence showing that the defendant had any knowledge of whether the deceased had any money about his person on the day in question, or that deceased had any money or was in the habit of carrying any money. There was no direct testimony that the defendant knew of the possession of money by the deceased," but the court held: "Where the motive of the assassination was in all probability robbery, the fact that the deceased had money on his person shortly before he was killed is admissible in evidence against the accused, without showing by direct evidence that the latter had seen the money or knew the deceased had it, it appearing that he had, on the same day, been in company with the deceased, done some work for him, and might have had an opportunity of seeing his pocket-book and knowing that it contained money."

In the case of State v. Lucey, 24 Mont. 295, 61 Pac. 994, the theory of the prosecution was that the homicide was committed for robbery. A witness was permitted to testify to how much money deceased had in the bank. The court said the evidence showed that deceased and defendant had been together preparing for a journey; that the defendant probably knew how much money deceased had in the bank. It also showed that he probably knew that deceased intended to withdraw his money from the bank. The evidence was clearly admissible as tending to prove motive. It furnished facts from which the jury could draw the inference of robbery and the state was entitled to the inference. Underhill, Crim. Ev. 3d ed. § 503; Bowen v. State, 140 Ala. 65, 37 So. 233; Jerome v. State, 61 Neb. 459, 85 N. W. 394; Smith v. Territory, 11 Okla. 669, 69 Pac. 805; Lancaster v. State, — Tex. Crim. Rep. —, 31 S. W. 515; State v. Donnelly, 130 Mo. 642, 32 S. W. 1124; Spancll v. State, 83 Tex. Crim. Rep. 418, 2 A.L.R. 593, 203 S. W. 357.

It is well settled that in the prosecution of a homicide case upon the theory that the homicide was committed for the purpose of robbery, the state may show that the defendant probably knew that the deceased had money upon his person, and from such evidence the jury may draw the inference that the killing was done to get the money. Surely jealousy is as great an incentive for murder as robbery. It is one of the strongest of human passions. It was the cause of the first murder,

and ever since Cain murdered Abel it has been a prolific source of murder and crime.

"Set me as a seal upon thine heart, as a seal upon thine arm; for love is strong as death; jealousy is cruel as the grave; the coals thereof are coals of fire, which hath a most vehement flame." Songs of Solomon, 8 : 6.

"For jealousy is the rage of a man: therefore he will not spare in the day of vengeance." Prov. 6 : 34.

That great delineator of human character, Shakespeare, describes jealousy in the warning of Iago to Othello, in the lines:

"O! beware, my lord, of jealousy;
It is the green-eyed monster which doth mock
The meat it feeds on;   .   .   .
But, O! what damned minutes tells he o'er
Who dotes, yet doubts; suspects, yet soundly loves!"

Later Iago in soliloquy says:

"Trifles light as air
Are to the jealous confirmation strong
As proofs of holy writ; this may do something.
The Moor already changes with my poison:
Dangerous conceits are in their natures poisons,
Which at the first are scarce found to distaste,
But with a little act upon the blood,
Burn like the mines of sulphur."

If Mrs. Wolf's testimony is true (and that was a question for the jury) there was a man in the Krueger room when the defendant stood in the hall, the door of the room open, and the circumstances and all the evidence proves that the defendant in all probability knew that the man was there. Mrs. Wolf's testimony was admissible to prove motive.

Appellant insists that the evidence was incompetent as it reflected upon the character of Mrs. Potter and tended to impeach her as a witness. Mrs. Potter had not been called as a witness at the time the testimony was admitted, and it was not introduced for the purpose of impeachment, but for the purpose of showing motive. This very question was before this court in the case of State v. Kent (State v. Pancoast) 5 N. D. 558, 35 L.R.A. 518, 67 N. W. 1052, and the court said: "Another objection absolutely fatal if this cross-examination was for

the purpose of affecting credibility only was the introduction of Exhibit P. Nothing is better settled than that, where a witness is asked as to collateral crimes for this purpose, his answers are absolutely conclusive on the party asking. 3 Rice, Ev. § 222, and cases cited. Nor does it change the rule that the denial comes by written admission of the witness. . . . But, as this evidence was all properly admitted for the purpose of showing motive, it is elementary that the judgment cannot be disturbed because it was inadmissible for another purpose, unless the jury were expressly instructed that they might consider the evidence for such improper purpose. We cannot presume that any improper use was made of such evidence."

An examination of the record in the case at bar discloses fair and impartial instruction to which no error is specified, and it follows, that since the evidence was admissible for the purpose of proving motive there was no error in its reception.

Appellant further claims, that the evidence is insufficient in law and in fact to sustain the verdict of murder in the first degree. We have carefully read the testimony and are of the opinion that it fully sustains the verdict of the jury, and the order overruling defendant's motion for a new trial and the judgment are affirmed.

NUESSLE and BURR, JJ., concur.

NUESSLE, J. (specially concurring). I agree in the conclusion reached by Chief Justice Burke that the judgment of conviction and the order denying the defendant's motion for a new trial must both be affirmed. I wish, however, to express briefly my views respecting the evidentiary point which seems to be the principal ground for the dissenting opinion.

With respect to the testimony of the witness Wolf, on account of the admission of which the defendant complains, I am doubtful, even though this evidence was inadmissible, that its reception was prejudicial to the defendant. But, in any event, I am of the opinion that it was properly received.

There is no question but that Webb, the deceased, came to his death at the hands of the defendant Potter. Potter's defense is that the killing was accidental. The state contends that it was willful. As

supporting this contention the state offered evidence to establish motive on the part of Potter—suspicion and jealousy of his wife. Consistent with this theory it offered the evidence of Mrs. Wolf. After showing other occurrences on the evening of the killing, the state showed that Mrs. Potter and Webb left the Potter home together; that shortly thereafter Webb returned; that he again left; that Potter who had been drinking was apparently suspicious; that he went to various friends and investigated as to the whereabouts of his wife; that he telephoned the same inquiry; that he finally went to the Q. B. & R. Building, where his wife's sister, Mrs. Krueger, roomed; that he went up the stairs and passed along the hallway where Mrs. Krueger's room was situated; that he did not stop at her door but went on to the end of the hall; that the occupants of the room must have heard him because Mrs. Krueger came to the door and inquired as to what he wanted. Apparently he was not invited into the room, and he did not enter. His wife came to the door and spoke to him, then put on her coat, came out, and induced him to go home. Now Mrs. Wolf's testimony offered by the state is that an hour or so before Potter came she heard someone come up the stairs and enter the room. Then she heard other footsteps. Then she heard a murmur of conversation and a man's voice in the room. Some time later Mrs. Krueger came. Apparently no one left the room after that. Then Potter came. It is of course clear that if Potter had no intimation that there was a man in the room where his wife was, the fact that a man was there would not be admissible. The pertinent thing was as to Potter's state of mind: what he thought; what he believed. The fact was of no consequence except as it induced the belief. Now it seems to me that the circumstances, including those shown by the testimony of Mrs. Wolf, are sufficient to warrant the inference that Potter had reason to believe and did believe that some man was in the room where his wife was. And if he believed that there was a man there, he may have believed that the man was Webb—whether rightly or wrongly is immaterial. Mrs. Wolf's testimony, of which the defendant complains, that she heard a man's voice there more than an hour before Potter appeared, is admissible, if for no other reason than to show that it was possible for one not in the room in question to hear voices there, including the man's voice. If Mrs. Wolf could hear, so also could Potter. And so it was shown that

a man was there before Potter appeared—that his voice could be heard and was heard, and that a man left there shortly after Potter and his wife departed, together with the circumstance that Potter was not invited into the room; that he passed the door without' rapping; that those within were vigilant to come to the door when they heard footsteps and apparently to see he did not enter the room—all of these things were admissible for the purpose of showing that Potter had reason to believe and did believe that there was a man in the room with his wife. The fact that Mrs. Wolf's testimony tended to show that Mrs. Potter and this man, whoever he may have been, were alone in the room for some time, was only incidental to the matter of the proof that the man was there and that Potter had grounds to believe and did believe that he was there. Of course this evidence was not admissible for the purpose of blackening—if it had that effect—Mrs. Potter before the jury and thus destroying her as a witness. But if it was otherwise relevant the fact that it had such an incidental effect did not render it inadmissible. State v. Gummer, 51 N. D. 445, 200 N. W. 20; State v. Heaton, 56 N. D. 357, 217 N. W. 531.

Some reference has been made to the argument of counsel for the state as set forth in his brief. Of course we are not bound by what counsel may have argued. Whether his argument is good or not is immaterial. Our whole duty is to consider the record and to determine the law as applicable under the record.

BIRDZELL and CHRISTIANSON, JJ. (dissenting). We are unable to agree with the opinion of the court concerning the admissibility of the evidence of Mrs. Wolf with reference to a clandestine meeting between Mrs. Potter and some man in the room of Mrs. Potter's sister, Mrs. Krueger, more than two hours before the homicide. Nor do we agree with much that is said in the principal opinion with reference to the change of the place of trial. We shall set forth our views of these questions in the order stated.

As we understand the opinion of the court, it holds that the evidence was admissible for the purpose of establishing that the defendant Potter had a motive for the shooting of Webb and that consequently it negatives the theory that the shooting was accidental; also, possibly, that the evidence was admissible as being within the res gestæ. As we

do not agree with that view of the testimony, we shall state as briefly as may be the reasons for our dissent. That the reasons may fully appear, however, it is necessary first to refer to the transcript showing just how the questionable testimony came into the case.

The evidence shows that Mrs. Wolf lived in Room 7 of the Q. B. & R. building and Mrs. Krueger in Room 8 just beside Room 7, the rooms being separated by a partition. Mrs. Wolf was asked whether she was in her room at about eight thirty and stated that she was. She testified that Mrs. Krueger went out about seven thirty, and when she was asked whether or not about eight thirty some lady came up to Mrs. Krueger's room the question was objected to as being incompetent, irrelevant, immaterial, speculative and having no bearing on the case. The court stated that he could not tell from the question whether it was or not. Whereupon the attorney for the state said they were going eventually to show that the lady who came up there was Mrs. Potter; that the foundation had already been laid in the previous evidence. The objection was overruled, and Mrs. Wolf testified that some one came up the back stairs and went into Mrs. Krueger's room. That was about a quarter of nine. In response, then, to the question as to whether anyone else came up there at or near that time, she testified that some one came up the front stairs and went into Mrs. Krueger's room. She was then asked with reference to conversation and there was objection to that on the ground that it was incompetent, irrelevant and immaterial. Whereupon the attorney for the prosecution stated that they had laid a foundation to show that Mrs. Potter went up to that room in view of her declarations at home in the presence of her husband that she was going up to her sister's to go to a show with her sister. He stated that they were not going to put in what the conversations were but only sufficient to show that it was a *woman* who was in the room. Whereupon the defendant's attorney argued that the only issue before the jury was whether the crime charged in the information was committed at the time and place stated; that the matter the state was inquiring about was entirely remote and not connected with the alleged homicide in any way; that it transpired several hours before the deceased was alleged to have been killed; that the defendant was not present, and does not claim to have been present. The state announced that it was going to show that he *became* present. The court

commented "You are asking that for the purpose of showing that there were people in the room?" The attorney for the state said "That is all," and the objection was overruled. The answer to the question "Did you hear some conversations" was "Yes, I heard a man's and a woman's voice." Immediately after that the witness was asked "Now, did anybody else come up there after that?" The answer was "Mrs. Krueger came home and went in the room." When asked about what time Mrs. Krueger came, the witness said "About ten o'clock." Hence, it is apparent that the state has proven here that Mrs. Potter came up the back stairs to her sister's room about a quarter to nine o'clock and at about the same time a man came up the front stairs and went to the same room and that they remained alone in the room until about ten o'clock when Mrs. Krueger came home. Then the state went on to show that Potter came up the front stairs shortly after Mrs. Krueger came home; that he walked to the end of the hall and back and Mrs. Krueger opened her door and asked if he was looking for some one. This witness was unable to state what Potter said in reply to the question, but she did hear Mrs. Potter say "Come on, Ray, let's go home." Mrs. Wolf nowhere testifies that Potter went to the door. All the conversation she says she heard between Potter and Mrs. Krueger took place in the hall; also, Mrs. Potter's remark "Come on, Ray, let's go home" was addressed to him while he was in the hall. Mrs. Wolf testified directly that he did not go into the room. She testified that they went down the front stairs and that soon after as she was going out of her room she saw a man come out of Mrs. Krueger's room and go down the back stairs; that this was about a quarter past ten. Mrs. Wolf testified that she did not know who the man was and that she did not know Oliver Webb. When the defense moved that the evidence of the witness be stricken it urged that the evidence did not show that the party referred to as being in the hall or in the room could have been the deceased for the reason that during that time he was either at the home of the defendant or with Mr. Snyder. The attorney for the state then stated that they did not claim it was the deceased, saying "We claim quite the opposite."

In the brief filed in behalf of the state on this appeal, counsel say: "there is absolutely no evidence that Potter knew where Webb was between the time that Webb left his place with Bartley, and the time

that Webb returned to his home and took Mrs. Potter down town on the last trip." Further, "As a matter of fact the circumstances in evidence disclose that there could not have been any question in the mind of Potter as to who it was that was getting out of the car at the time of the fatal shooting." If, then, the shooting were intentional he knew he was shooting Webb and not some other man. Further, "As a matter of fact, the conduct of Potter in the shooting cannot be explained in any manner other than by his knowledge that Mrs. Potter spent the previous portion of the evening in a clandestine meeting. . . . We do not want to be misunderstood as claiming that the man in this room actually was Webb. We do not contend that it was Webb, as the evidence of Bartley shows that it could not have been Webb, but we do believe, and contend that Potter believed it was Webb who was in that room."

As we understand the contention of the state thus gleaned from the brief, it is that the state might properly show, as it did, that Mrs. Potter had clandestinely met a man other than Webb in the room of her sister and had remained alone with him there for at least an hour and a quarter before her sister, Mrs. Krueger, returned. This it could show, it is contended, in order to give confirmation to a suspicion, supposedly entertained by Potter, that Webb and Mrs. Potter were meeting clandestinely. We cannot see how evidence that Mrs. Potter had in fact clandestinely met some other man would confirm Potter's suspicion that she had met Webb.

The state does not contend that Potter knew of any meeting such as Mrs. Wolf's evidence tends to prove. It seems to us that it could not substantiate any such contention, for the circumstances themselves do not afford any evidence that Potter knew of any such meeting. It must be remembered that when Potter came to the Q. B. & R. building in search of his wife at least an hour and a half before the homicide, he did not find his wife alone but found her with her sister. There is absolutely nothing in the evidence to indicate that he had any reason to suspect that she and her sister had not been together in that room during the whole time that Mrs. Potter was there. Hence, there is nothing in this circumstance that would tend in the least degree to confirm any suspicion that he might have had in his mind that his wife had clandestinely met Webb there. If in fact she had so met another

man there, manifestly, the situation had been so entirely changed by Mrs. Krueger's return before Potter's arrival as to afford no evidence at that time of a previous clandestine meeting. If it be assumed that the state could properly show the presence of a man in the room with Mrs. Krueger and Mrs. Potter, it by no means follows that it could also show the presence of a man with Mrs. Potter alone some time before. We can see no proper legal basis for admitting in evidence to establish the motive of the defendant for the killing of the deceased any indiscreet conduct of the defendant's wife in relation to some other man without the knowledge of the defendant.

Neither is the evidence admissible, in our opinion, as part of the res gestæ. Conceding that it was proper to inquire what Potter was doing during the evening leading up to the homicide, it does not follow that it was proper to inquire what his wife had been doing during the period of about two hours and a half prior to the shooting, especially concerning her conduct while not in his presence. We can see no connection whatsoever between any supposed clandestine meeting of the defendant's wife and some other man more than two hours before the homicide, which was unknown to the defendant, and the homicide in question. It seems to us that the mere statement of the evidence in the record, coupled with the fact that the defendant did not know of any such meeting is an absolute demonstration that it was not any part of the res gestæ. There can be no possible merit in counsel's contention that the conduct of Mrs. Potter would be admissible as part of the res gestæ, even though Potter had never gone to the Q. B. & R. building. No doubt *his* conduct there was admissible, as well as any circumstance, having relation to the ultimate homicide, with which he was made aware at the time of his visit; but this clearly does not include conduct of his wife in altogether different circumstances. How could an act with which the defendant was in no way connected by knowledge or otherwise be a circumstance tending to show his connection with a crime? This is clearly res inter alios acta and not res gestæ.

Since the evidence was, as it seems to us, clearly inadmissible for any purpose, the next question that arises is whether or not its admission prevented the defendant from having a fair trial. The record discloses rather clearly what the effect of the evidence was likely to be.

Previously, there had been one trial of this cause resulting in a disagreement of the jury. Upon that trial facts had been developed which showed that the defendant's wife was the only eyewitness to the shooting and was the witness who had been most familiar with the circumstances leading up to the shooting. Hence, it was apparent that the defendant would be required to rely largely upon her testimony to substantiate his theory that the shooting was accidental. If the effect of her testimony could be lessened by showing circumstances derogatory to her character, it would put her in a very unfavorable light before the jury and would doubtless affect her credibility. Of course, this is not to say that when she had assumed the position of a witness and was subjected to cross-examination, it might not be proper to ask her concerning even a criminal course of conduct with a man other than her husband. But neither, we apprehend, would it be contended that the state would not be precluded by her denial (State v. Kent (State v. Pancoast) 5 N. D. 516, 35 L.R.A. 518, 67 N. W. 1052), independent testimony as to such collateral fact being inadmissible.

Holding the testimony admitted in this case to be admissible is, in effect, to allow the state to discredit the principal witness for the defendant by impeaching her through independent evidence. It relieves the state from the necessity of even laying a foundation by cross-examining her and entirely circumvents the rule laid down in the Kent Case, supra, which would forbid the introduction of independent evidence of collateral matters for the purpose of impeachment. Hence, if this evidence were inadmissible, as we believe it was, upon any primary issue in the case, it is difficult to see how it could have done other than to have prejudiced the defendant in his right to a fair trial. This is not a case where the record shows the defendant to have been so clearly guilty of the crime for which he stands convicted, namely, first degree murder, that the error in the introduction of such evidence can be said to be purely technical (Comp. Laws 1913, § 11,013) or non-prejudicial (§ 11,088). Upon the former trial the jury was unable to agree. The defendant's contention that the shooting was accidental finds support in the statement of the deceased to Mrs. Potter and in his dying declaration to his father.

As regards what is said in the majority opinion concerning the application for a change of venue, we are agreed with the principles stated

in paragraph two of the syllabus, namely, that an erroneous ruling on an application for a change of venue constitutes a ground for a new trial in a criminal action; and that in a case where a motion for a new trial is made error predicated upon such ruling should be so raised. The majority opinion, however, is not placed solely upon this principle. It further holds, in effect, that the trial court was correct, or at least that it committed no error, in granting a change of venue; and that, in any event, the defendant waived the question by failing to renew the objection when the case was called for trial in McLean county. We cannot assent to these holdings.

At the outset it is only fair to state that upon the oral argument counsel for the state stated that no point was made of the fact that the question relating to the change of venue was not raised upon the motion for a new trial; that the state had no intention and no desire to urge the failure to so raise it as a ground why the question should not be considered on this appeal; that, on the contrary, the state desired to submit, and did submit, the question whether it was entitled to a change of venue upon the merits thereof.

It should, also, be noted that the application for a change of venue in this case was not submitted to or determined by the judge who presided at either the former trial or at the present trial of this case. His only connection with the case was to hear and determine the application for a change of venue. At the time of the former trial he was not one of the district judges of this state. In short, the application for a change of venue was submitted to a judge who, in the very nature of things, could have no knowledge of anything that occurred upon the former trial except such as he received from the showing made upon the hearing. In the circumstances the rule stated in paragraph one of the syllabus as to the discretion vested in the trial court in applications of this kind does not apply with the same force as where such application is submitted to the judge who presided upon the former trial. See Braithwaite v. Aiken, 2 N. D. 57, 63, 49 N. W. 419.

It is undisputed that upon the former trial no application was made for a change of place of trial and that then a trial jury was obtained without either party exhausting the peremptory challenges allowed by law.

Our laws provide that a change of place of trial may be awarded

to either the state or the defendant in a criminal action (Comp. Laws 1913, §§ 10,756, 10,768) upon the petition on oath of the party applying for the change of place of trial "that he has reason to believe and does believe, *and the facts upon which such belief is based,* that he cannot receive a fair and impartial trial in the county or judicial subdivision where said action is pending, upon any of the following grounds: . . . 3. That it is impossible to obtain a jury in the county or judicial subdivision that has not formed an opinion, as to the guilt or innocence of the defendant, such as would disqualify them as jurors. . . ." (Comp. Laws 1913, § 10,756).

Our statute also provides:

"No person shall be disqualified as a juror by reason of the fact that he may have heard from others or read in newspapers or public journals, any statement or statements with regard to the case to be submitted to the jury, if it shall appear to the satisfaction of the court that the impression remaining upon the mind of such person from the statements so communicated to him, will not prevent him from trying the case fairly and impartially." (Comp. Laws 1913, § 10,812).

Let us examine the showing made by the state as basis for the order changing the place of trial.

The state was represented upon the present trial by the then state's attorney and a special prosecutor. The special prosecutor had participated in both trials. The state's attorney who participated in this trial did not participate in the first trial. The application for the change of place of trial is supported by the affidavits of the special prosecutor, the state's attorney and of seventeen residents of the city of Bismarck. In the affidavit of the special prosecutor this statement is found:

"This affiant further states that he has reason to believe and does believe that the plaintiff in the above entitled action, the state of North Dakota, cannot receive a fair and impartial trial of the issues in the above entitled action in the county of Burleigh in the State of North Dakota, *nor in the judicial subdivision where said action is pending; this affiant further states that it is impossible to obtain a jury in Burleigh county, and this affiant verily believes impossible to obtain a jury in the Fourth Judicial District, that has not formed an opinion as to the guilt or innocence of the defendant, such as would disqualify them as jurors."*

The typewritten affidavit of the state's attorney contained in the record discloses that the affidavit as prepared for his signature contained precisely the same statement as that quoted above, but that before signing it he struck out the portion which has been italicized. The affidavits of the seventeen residents of Bismarck are identical in form. The only differences in the seventeen affidavits are the names of the affiants, and the number of years the particular affiant has been a resident of Burleigh county. The affidavits were drawn with the names left in blank so as to be available for whatever person might eventually sign them. Each of the affidavits was in the following form:

"———————————— being first duly sworn upon oath, deposes and says that he is a citizen, resident, and taxpayer of the county of Burleigh and state of North Dakota, and that he has resided in the state of North Dakota and in the county of Burleigh for ——— years last past; this affiant further states that he has reason to believe and does believe that the plaintiff in the above entitled action, the state of North Dakota, cannot receive a fair and impartial trial of the issues in the above entitled action in the county of Burleigh in the state of North Dakota, nor in the judicial subdivision where said action is pending; this affiant further states that it is impossible to obtain a jury in Burleigh county, and this affiant verily believes impossible to obtain a jury in the Fourth Judicial District, that has not formed an opinion as to the·guilt or innocence of the defendant, such as would disqualify them as jurors.

That the defendant, Ray Potter, and the deceased, Oliver Webb, were residents of said Burleigh county for many years last past, and were personally and widely acquainted with a great number of persons residing in said Burleigh county, who are subject to being called as jurors; that since the date of the killing of said Oliver Webb a keen public interest has been taken in the facts and circumstances surrounding the same, and the public interest in said killing has been evidenced by general conversations and expressions of opinion as to the guilt or innocence of said defendant, almost continuously since said killing and up to the date hereof; that in the December 1928 term of the district court of Burleigh county, said defendant was tried for the crime of murder in the first degree, and the jury disagreed, and during the

trial of said action, which consumed, with adjournments, several weeks, the public interest of the people of the western part of the state was further inspired and accentuated by the daily newspapers at Bismarck and Mandan, both of which papers have a very wide circulation, and which said papers carried daily, as leading articles, supplemented with large headlines, the report of the trial, the evidence, and all the facts and circumstances surrounding the same; that the Bismarck Tribune and the Mandan Daily Pioneer, as this affiant is informed and verily believes, cover the entire western portion of the state, including the counties west of the Missouri river, and the Bismarck Tribune particularly covers the field most thoroughly in Burleigh, McLean, Emmons, Logan and Kidder counties; that the wide dissemination of information concerning the killing, and the testimony produced at the former trial, the newspaper discussion of said case, the public interest that has been inspired in connection therewith, and the general discussion of said matter, is such that this affiant verily believes that it would be impossible to obtain a jury in Burleigh county that had not formed an opinion as to the guilt or innocence of the defendant, such as would disqualify them as jurors, and this affiant states to the court, under oath, that in his judgment the ends of justice demand that the place of trial of this action be changed from Burleigh county to some county outside of the Fourth judicial district, where the cause for change complained of does not exist.

(Signed) ————————————.''

What facts are stated in these affidavits as a basis for a holding that it was "impossible to obtain a jury in Burleigh county that had not formed an opinion as to the guilt or innocence of the defendant, such as would disqualify them as jurors?" Can it be seriously contended that any facts whatever are stated except such as would exist in each and every homicide case? To say that the affidavits presented here constitute a showing of *facts* justifying the trial court to order a change of trial is tantamount to saying that the trial court is vested with an arbitrary and uncontrollable power to so order. But no such power is vested. The state is not entitled to a change of venue as a matter of right. State v. Winchester, 19 N. D. 756, 122 N. W. 1111.

The state is entitled to a change of place of trial only upon showing as a fact that the condition prescribed by the statute does exist; and a

trial court has no lawful right to order such change in absence of such showing.

"The affidavit of the party applying for a change should state the facts in such a manner as to enable the court to draw its own inference whether an impartial trial can be had in the particular case. Obviously the facts stated should not be confined to mere surmises or apprehensions on the part of the party applying for the change." 25 Cal. Jur. p. 906, § 38.

The identical statutory provision involved here was construed and applied by the supreme court of the Territory of Dakota in Territory v. Egan, 3 Dak. 119, 13 N. W. 568. In that case the court said:

"The affidavits must state the *facts* and *circumstances* from which this conclusion is deduced, that a fair and impartial trial cannot be had; the court must be *satisfied* that the facts *positively* sworn to in the affidavit and not from a general *conclusion* to which the defendant may swear or which his witnesses may depose they verily *believe* to be true."

In that case the court further held that in determining whether a sufficient showing had been made, the affidavits must be construed in light of the statute which provided that "no person should be disqualified as a juror by reason of having formed or expressed an opinion . . . founded upon rumor or statements in public journals."

An applicant for a change of venue has the burden of proof; he must establish the facts which entitle him to the relief sought, and the affidavits submitted by him must state facts and not conclusions. Curren v. Story, 41 N. D. 361, 170 N. W. 875; Wolfson v. Schieber, 52 N. D. 165, 201 N. W. 830. The affidavits in the case at bar stated no facts different from those which would exist today in every homicide case in Burleigh county where one resident of that county was charged with murdering another resident. The statute does not permit or contemplate that a round-robin shall be circulated or that expert witnesses shall be called upon to testify as to whether in their opinion it is possible or impossible to obtain a fair and impartial trial jury. That is the ultimate question which the court must decide and that decision must be based upon facts and not upon surmises, conjectures or conclusions of others. It is elementary that under a statute like ours the trial judge has no right to order a change of venue upon his

own. motion. The statute fixes the place of trial of all criminal causes and the trial court has no right to change such place of trial except upon due application supported by adequate showing. It is intimated that the trial court made some investigation of the facts, that is, in effect received evidence, outside of that submitted by the respective parties. Obviously, if this were done it was in violation of the rights of the parties. A hearing to determine whether a change of place of trial shall be had is a judicial hearing and should be conducted in conformity with rules applicable thereto. Each party has a right to know what proofs are adduced and to be afforded an opportunity to refute whatever showing is made against his interests. The place for a judicial hearing is in a courtroom—not outside of it. The time to conduct it is when the parties thereto are present or have an opportunity to be present.

There is nothing in this case from which it reasonably may be inferred that an impartial trial jury could not have been obtained in Burleigh county. The showing in this case, to the contrary, is far less than that made in Territory v. Egan, 3 Dak. .119, 13 N. W. 568, supra. Furthermore, it will be noted that all the showing made by the state was to the effect that an impartial trial jury could not be obtained at all in the fourth judicial district. The affidavit of the special prosecutor and of the seventeen residents of Bismarck were all to this effect and the affidavit of the state's attorney was not to the contrary. He merely refrained from expressing any opinion on that question,—he merely struck out of the affidavit the statement to the effect that a trial jury could not be obtained in the fourth judicial district. Hence, the order granting the change of venue to, and ordering that a trial be had in, McLean county, was one which, in the very nature of things, the defendant could not have anticipated at all as it was in the very teeth of the entire showing made by the state. The order as made rests upon no showing whatsoever. No facts were shown warranting its entry.

There is an intimation, if not a holding, in the prevailing opinion that the defendant waived the error, if any, in granting plaintiff's application for a change of venue by not making an objection when the case came on trial in McLean county. To this we cannot assent. Under our statute a party who opposes an application for a change of venue is

not required to renew his objection when the case is called for trial in the county to which it has been transferred. Whatever objection and exception he took at the time the order was made remain fully effective without being renewed at the time the case comes on for trial. A party is not required to make a nuisance of himself by repeated reiteration of an objection once made. In the absence of a statutory requirement to the contrary there is no waiver of an objection once made unless the party who made it subsequently assumes some position or commits some act which is so wholly inconsistent with the former objection that it must be assumed that he has departed therefrom and voluntarily assented to the course which he formerly asserted to be erroneous.