2014 ND 101

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Omar Mohamed KALMIO, Defendant and Appellant.**

**No. 20130074.**

Supreme Court of North Dakota.

May 28, 2014.

Kelly Ann Dillon, Assistant State's Attorney, Minot, ND, for plaintiff and appellee.

Russell John Myhre, Valley City, ND, for defendant and appellant.

CROTHERS, Justice.

[¶ 1] Omar Mohamed Kalmio appeals after a jury found him guilty of four counts of class AA felony murder after a jury trial. Kalmio argues the judgments should be reversed because the district

court abused its discretion by allowing hearsay testimony and testimony regarding his prior bad acts, denying his request for an alibi jury instruction and denying his motion for mistrial on the grounds of prosecutorial misconduct. Kalmio also argues the evidence is insufficient to sustain the guilty verdict. We affirm.

I

[¶ 2] Kalmio was charged with murdering Sabrina Zephier, Jolene Zephier, Dylan Zephier and Jeremy Longie on January 28, 2011. Sabrina Zephier's roommate found her body in their Minot apartment on January 28, 2011. She was shot in the head at close range. Sabrina Zephier and Kalmio's five-month-old daughter was found unharmed at the scene of Sabrina's murder. Approximately one hour later, Sabrina Zephier's mother, Jolene Zephier; brother, Dillon Zephier; and Jolene Zephier's boyfriend, Jeremy Longie, were found dead in their Minot home. Jolene Zephier, Dillon Zephier and Longie were killed by gunshot wounds to the head. A dog also was shot at the second crime scene. The same firearm killed all four people and was never located.

[¶ 3] An arrest warrant was issued for Kalmio on August 3, 2011. Kalmio was charged with murdering Sabrina Zephier. Kalmio's trial was scheduled for June 4, 2012. On May 18, 2012, the State moved to amend information and calendar a new preliminary hearing to include charges for the murders of Jolene Zephier, Dylan Zephier and Jeremy Longie.

[¶ 4] On December 4 and 5, 2012, a hearing was held on the State's motion in limine to allow hearsay testimony of various witnesses and to allow testimony concerning Kalmio's prior bad acts. On December 20, 2012, the district court issued an order on the State's notice of intent to introduce prior bad acts and motion in limine. The December 20 order discussed each witness's testimony and made preliminary rulings on admissibility, subject to change depending on the presentation at trial. On January 29, 2013, the district court issued a corrected order on the State's notice of intent to introduce prior bad acts and motion in limine. Leading up to the second order, the State offered testimony of Sabrina Zephier's roommate, Elizabeth Lambert, and the district court heard arguments from both sides about the admissibility of her testimony. The district court preliminarily ruled Lambert could testify, subject to the possibility of a limiting instruction based on her actual testimony.

[¶ 5] A nine-day trial occurred between January 23 and February 4, 2013. Testimony established Kalmio worked in the Williston area and was staying at an oil rig site when the murders occurred. The State presented testimony from an individual claiming to have seen Kalmio and his brother leave the rig site in one of the company's white trucks during the time frame of the murders. The State presented testimony that a white pickup was seen near Sabrina Zephier's apartment the night of the murders. Testimony also established Kalmio and Sabrina Zephier had a tumultuous relationship and disagreed over the care and custody of their minor child. Evidence demonstrated that Jolene Zephier claimed Kalmio and Sabrina Zephier's child on her income tax return to obtain a refund. Evidence also established the same murder weapon was used in all four murders and Kalmio had inquired about where he could obtain a gun.

[¶ 6] Kalmio asserts the testimony and evidence are circumstantial and nothing directly links him to the murders. Kalmio argues none of the witnesses directly witnessed any violence between Sabrina Zephier and himself. He also asserts that

none of the white trucks he had access to were positively identified in surveillance footage of the main route between Williston and Minot. Further, he argues that although a weapon linked the murders, no murder weapon was found and no evidence established he possessed or purchased a gun or ammunition.

[¶7] Kalmio did not submit a notice of alibi as required by Rule 12.1, N.D.R.Crim.P., yet he requested an alibi jury instruction at the conclusion of testimony. The district court denied Kalmio's requested alibi instruction. The State used a PowerPoint in its closing argument. Kalmio objected when the PowerPoint displayed slides with images of a gun and red circles, which he argued resembled blood. Kalmio moved for a mistrial, which the district court denied. The district court instead directed images of the gun and red circles be removed and instructed the jury to disregard the removed images. The record on appeal did not include the PowerPoint presentation, but included verbal descriptions of the excluded images.

[¶8] The jury found Kalmio guilty of four counts of murder. The district court sentenced Kalmio to four consecutive life sentences without the possibility for parole. Kalmio appeals.

## II

[¶9] Kalmio argues the district court abused its discretion by allowing hearsay testimony and testimony regarding Kalmio's prior bad acts.

[¶10] "The district court exercises broad discretion in determining whether to admit or exclude evidence, and its determination will be reversed on appeal only for an abuse of discretion." *State v. Chisholm*, 2012 ND 147, ¶10, 818 N.W.2d 707. "A district court abuses its discretion in evidentiary rulings when it acts arbitrarily, capriciously, or unreason-

ably, or it misinterprets or misapplies the law." *Id.*

[¶11] The State filed a notice of intent to introduce prior bad acts pursuant to N.D.R.Ev. 404(b) and motion in limine on September 14, 2012. A two-day hearing on the motion was held, and the court heard testimony from the State's witnesses. The district court issued an order, making admissibility determinations for each witness's testimony. The district court later issued an order addressing the admissibility of Elizabeth Lambert's testimony because she was not available for the first hearing. The admissibility of each witness's testimony was determined under either a hearsay analysis or a prior bad acts analysis. During the motion in limine hearing, Kalmio made a standing objection to the hearsay presented by the witnesses, which the district court granted. At trial, Kalmio again asserted this standing objection to hearsay offered by the motion in limine witnesses, which the court granted him. Although Kalmio was granted the standing objection, he reasserted the standing objection on several occasions, after which the district court made a ruling on the specific piece of evidence Kalmio objected to.

[¶12] "One of the touchstones for an effective appeal on any proper issue is that the matter was appropriately raised in the trial court so it could intelligently rule on it." *State v. Cain*, 2011 ND 213, ¶29, 806 N.W.2d 597 (quoting *State v. Anderson*, 2003 ND 30, ¶6, 657 N.W.2d 245). The standing objection was granted in the motion in limine hearing, and Kalmio again asserted his standing hearsay objection for the motion in limine witnesses in the district court. North Dakota consistently has recognized the validity of standing objections granted in the district court. *See State v. Aabrekke*, 2011 ND

131, ¶ 3, 800 N.W.2d 284; *O'Connell v. Hjelle*, 143 N.W.2d 251, 254 (N.D.1966). Further, several federal court of appeals decisions recognize the use of standing objections to preserve issues for appeal. *Muhammad v. Sec'y, Florida Dep't of Corrs.*, 733 F.3d 1065, 1072 (11th Cir.2013) ("Florida Law consistently recognizes that a standing objection preserves an issue for appeal.") (quoting the district court); *Reed v. Thalacker*, 198 F.3d 1058, 1063 (8th Cir.1999) (recognizing the possibility that defense counsel's continuous objections to similar hearsay testimony may have constituted a standing objection, in which case the issue would have been preserved for appeal); *United States v. Ruiz*, 987 F.2d 243, 246 (5th Cir.1993) (rejecting the argument Ruiz failed to identify specific statements that were erroneously admitted because the issues were preserved by Ruiz making a standing objection to all hearsay statements made by his alleged co-conspirators). However, this Court has limited the use of standing objections when the objection was too indefinite. *Hultberg v. Hjelle*, 286 N.W.2d 448, 458 (N.D.1979). Kalmio specifically objected to the hearsay testimony offered by the motion in limine witnesses, a sufficiently definite objection. Kalmio preserved the hearsay issues for appeal, allowing us to reach the merits and review the admissibility of the evidence offered at trial, even when Kalmio did not make an explicit objection to the testimony offered at trial.

[¶ 13] Although Kalmio argued in the district court that the evidence was inadmissible hearsay and prior bad act evidence, he limits his argument on appeal to hearsay grounds. *See Vann v. Vann*, 2009 ND 118, ¶ 41, 767 N.W.2d 855 ("[A] party waives an issue by not providing supporting argument or citations to relevant authorities."). We therefore examine whether the district court abused its discretion

in allowing hearsay testimony and in performing its relevancy analysis.

[¶ 14] " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.D.R.Ev. 801(c). An exception to the hearsay rule allows statements for then existing state of mind:

"A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

N.D.R.Ev. 803(3). "For a statement to be admissible under the state of mind or emotion exception to the hearsay rule, the declarant's statement must be contemporaneous with the mental or emotional state sought to be proven, there must be no circumstances suggesting a motive for the declarant to misrepresent his or her state of mind, and the declarant's state of mind must be relevant to an issue in the case." *Schumacker v. Schumacker*, 2011 ND 75, ¶ 15, 796 N.W.2d 636 (allowing statements from children indicating a state of mind or emotional condition resulting from domestic violence in the home to show state of mind of child, but not to prove facts of domestic violence) (citing 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.05[2] (2nd ed.2011)). "Under this exception, statements may not be offered to prove the truth of the underlying facts, but only to show the declarant's state of mind or emotional condition." *Schumacker*, at ¶ 15.

[¶ 15] The sixth amendment provides for different treatment of testimonial and nontestimonial hearsay:

"The Confrontation Clause of the U.S. Const. amend. VI, states that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....' In *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held the Sixth Amendment prohibits the admission of testimonial hearsay against the accused, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the declarant. The Confrontation Clause does not apply to nontestimonial hearsay. *Id. See also Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (only testimonial statements cause the declarant to be a 'witness' within the meaning of the Sixth Amendment)."

*State v. Sorenson*, 2009 ND 147, ¶ 16, 770 N.W.2d 701. "Although the Court did not define what a testimonial statement is, it said, 'An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.' " *Id.* at ¶ 17 (quoting *Crawford*, at 51, 124 S.Ct. 1354).

[¶ 16] Each witness whose testimony was offered by the State during the motion in limine hearings and who testified at trial is addressed below.

### Kari Salmon

■ [¶ 17] Kari Salmon, Kalmio's and Jolene Zephier's probation officer, met with Jolene Zephier and Sabrina Zephier on December 21, 2010. Salmon referred Sabrina Zephier to the Domestic Violence Crisis Center. The district court determined Sabrina Zephier's statements to Salmon were testimonial and inadmissible at trial, but allowed Salmon to testify about Sabrina Zephier's overall physical condition, an injury she observed to Sabrina Zephier's eye and her referral of Sabrina Zephier to the Domestic Violence Crisis Center. The district court did not abuse its discretion in admitting this testimony about the witness's observations of Sabrina Zephier's condition.

### Ashley Counts

■ [¶ 18] Ashley Counts worked at the Domestic Violence Crisis Center in Minot and met with Sabrina Zephier on December 22, 2010. The district court determined that because the Domestic Violence Crisis Center is not part of law enforcement, statements made to Counts by Sabrina Zephier were nontestimonial hearsay. The district court applied the *Schumacker* formulation and found, "Sabrina's statements were contemporaneous with her emotional state of fear, there [were] no circumstances suggesting a motive for Sab[r]ina to misrepresent her fear, and Sabrina's fear [was] relevant to demonstrate why she took certain actions relevant to the case."

[¶ 19] Kalmio argues that the district court erred following *Schumacker* in this criminal case and that it instead should have applied the rule of law in *Bernhardt v. State*, 684 N.W.2d 465, 474 (Minn.2004) (citing *State v. Blanchard*, 315 N.W.2d 427, 432–33 (Minn.1982)). We decline to adopt Minnesota's *Bernhardt* formulation for determining when a victim's fear of a perpetrator is admissible; however, we agree our formulation merits clarification.

[¶ 20] In *Schumacker*, we cited *Weinstein's Federal Evidence* for discussion of admissibility under the state of mind exception. *Schumacker*, 2011 ND 75, ¶ 15, 796 N.W.2d 636 (citing 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.05[2] (2nd ed.2011)). In discussing the requirement that "[t]he declarant's state of mind must be relevant to an issue in the case," *Wein-*

*stein's* lists examples where a hearsay declarant's state of mind may be relevant, including to show a defendant's motive. 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.05[2][a] n. 7 (2nd ed.2013) (citing *see United States v. Tokars,* 95 F.3d 1520, 1535 (11th Cir.1996) ("[E]vidence of victim's state of mind is admissible under Fed.R.Evid. 803(3), at least when relevant to defendant's motive to kill[.]")). In *Tokars,* the homicide victim intended to leave her husband and take his money, apparently prompting him to have her killed and making her state of mind relevant to his motive. *Id.* at 1535. Like in *Tokars,* here several trial witnesses indicated Sabrina Zephier and Jolene Zephier feared Kalmio because he beat Sabrina Zephier and made threats against their lives. The number of witnesses reporting similar information indicates both Sabrina Zephier and Jolene Zephier openly expressed these fears. Kalmio logically would know of their fears because he was witnessed mistreating Sabrina Zephier, and Jolene Zephier directly threatened him that she would report him to his parole officer. Kalmio knew of their fear, including the possible repercussions for him if they conveyed their fear to key people such as Kalmio's parole officer; therefore, Sabrina Zephier's and Jolene Zephier's fear were relevant to his motive to kill.

[¶ 21] Requiring that the declarant's state of mind must be *relevant to an issue* allows for application of the state of mind hearsay exception, recognizing, "[A]dmissibility depends in significant measure on what was said and on the ultimate fact the evidence is offered to prove." 4 Clifford S. Fishman, *Jones on Evidence Civil and Criminal* § 29:18 (7th ed.2000). Minnesota's *Bernhardt* formulation rigidly limits use of the hearsay exception to where the victim's state of mind *is*

a *relevant issue* and notes those cases generally arise when "the defendant raises the defense of accident, suicide, or self-defense." *Bernhardt,* 684 N.W.2d at 474 (quoting *Blanchard,* 315 N.W.2d at 432–33). While it is an easier case for admission when the victim's state of mind is an element of the crime, cause of action or defense, the victim's state of mind is not an element of class AA felony murder. That the victim's state of mind is not an element of the crime, cause of action or defense, however, does not remove the possibility that evidence of the victim's state of mind may be relevant to a factual issue, such as the defendant's motive or intent. *See* Fishman, *supra,* §§ 29:17, 29:18 and 29:18 n. 92 (citing *United States v. Joe,* 8 F.3d 1488 (10th Cir.1993), *cert. denied,* 510 U.S. 1184, 114 S.Ct. 1236, 127 L.Ed.2d 579 (1994) (admitting under 803(3) a murder victim's statement she was afraid of her husband, which the author speculates was relevant if the jury was permitted to infer from her fear of defendant the state of mind with which he acted eight days later); *State v. Fulminante,* 193 Ariz. 485, 498, 975 P.2d 75 (1999) (admitting murder victim's statements she feared and disliked defendant insofar as they may minimally be relevant to show defendant's motive, but ultimately reversing for admission of two other statements)). The *Schumacker* formulation is not so rigid as the *Bernhardt* formulation, and it allows for the possibility that while the victim's state of mind is not an element of the crime, it still may be relevant to a factual issue such as the defendant's motive. We require a case-specific analysis of what ultimate fact the evidence of the victim's state of mind is offered to prove.

[¶ 22] The State offered Ashley Counts's testimony to provide insight into Kalmio's tumultuous relationship with Sabrina Zephier. The district court allowed her testimony about Sabrina Zephier's fear

because it was "relevant to demonstrate why she took certain actions relevant to the case." The district court allowed Counts to testify about why she met with Sabrina Zephier, about what Sabrina Zephier told her concerning her assault by her boyfriend, about Sabrina Zephier's physical condition and demeanor and about what she advised Sabrina Zephier to do. The district court also admitted the assessment form Sabrina Zephier completed during the in-take process at the Domestic Violence Crisis Center under the business record exception to the hearsay rule, N.D.R.Ev. 803(6), after balancing and limiting the use of several words under Rules 402 and 403, N.D.R.Ev. Counts also was allowed to testify that Sabrina Zephier initially marked "yes" on the assessment form that she was afraid Kalmio would harm or kill her, before changing her answer to "no." Although admitting evidence of Sabrina Zephier's fear to show why she took certain actions relevant to the case is not an entirely clear purpose on its face, it remains that Kalmio's motive for committing the alleged crimes was an issue in this case. The fear Sabrina Zephier expressed to Counts, in combination with her physical condition from Kalmio's recent beatings were at least minimally relevant to the possible motive or intent Kalmio acted with if he was responsible for the murders one month later. Sabrina Zephier's fear and physical condition were relevant to Kalmio's motive. *See Tokars,* 95 F.3d at 1535; *Joe,* 8 F.3d at 1492–93; *Fulminante,* 193 Ariz. at 498, 975 P.2d 75. Despite that Sabrina Zephier's fearful state of mind is not itself an element of murder, based on the law and rationale cited above, the district court did not abuse its discretion in admitting testimony from Ashley Counts concerning Sabrina Zephier's physical condition and why she feared Kalmio.

### Terri Zephier

[¶ 23] Terri Zephier, Sabrina Zephier's sister and Jolene Zephier's daughter, testified about incidents stemming from a Facebook message she received from Sabrina Zephier on December 20, 2010 and about what Terri Zephier saw when she and her mother arrived at Sabrina Zephier's apartment. The district court initially held Terri Zephier's testimony would be subject to the State's ability to meet the *Schumacker* test's contemporaneousness and relevance to an issue in the case requirements. The district court preliminarily declined to rule whether Terri Zephier's testimony regarding Jolene Zephier's dogs would be admissible at trial.

[¶ 24] At trial Terri Zephier testified she received a Facebook message from Sabrina Zephier on December 20, 2010 that read:

"Terri, I need you to come get me ASAP. Don't call because if Omar knows you are calling he will get mad and start hitting me again. My face is fucked up, Terri. Come up here and key the door. But I need you, please, my face is fucked up and my body, please. ASAP when you read this. But if you call he will start hitting me again. Please just come up here, you and mom come, 'kay, he is crazy."

Terri Zephier testified that when she arrived, Sabrina Zephier's face was swollen and her body had belt marks from "top to bottom." Terri Zephier then testified about Jolene Zephier's two dogs, one small and one big. Terri Zephier testified about how Kalmio was afraid of the big dog and always would ensure the dog was not in sight when he came to Jolene Zephier's home. Terri Zephier also testified that she had been convicted for providing false information to police, that she had to refile Jolene Zephier's tax returns for her and

that Jolene Zephier struggled with drugs. Finally, Terri Zephier testified about the day she learned about the deaths in her family, including whether she talked to Kalmio and how she found out. The district court directed the Facebook messages be redacted prior to December 20, 2010, with no objections from either party.

[¶ 25] Kalmio did not object to Terri Zephier's trial testimony except for the standing hearsay objection he made at the motion in limine hearing. The district court admitted the testimony, subject to meeting the *Schumacker* requirement that it be relevant to an issue in the case. Terri Zephier's testimony indicated that Sabrina Zephier expressed fear of Kalmio and that Kalmio beat her. Sabrina Zphier's statements were confirmed when Terri Zephier arrived at Sabrina Zephier's apartment and saw her face was swollen and she was covered in belt marks. Sabrina Zephier's statements about her fear and physical condition are at least minimally relevant to show Kalmio's motive. *See Tokars*, 95 F.3d at 1535; *Joe*, 8 F.3d at 1492–93; *Fulminante*, 193 Ariz. at 498, 975 P.2d 75. Because the testimony offered by Terri Zephier could be relevant to the issues of motive or intent, the district court did not abuse its discretion in admitting the testimony.

### Rochelle Greger

[¶ 26] Rochelle Greger was Sabrina Zephier's aunt, whom Sabrina called periodically. At the motion in limine hearing, the district court had concerns about Greger's testimony and declined to rule on its admissibility at that time.

[¶ 27] At trial, Greger testified she spoke with Sabrina Zephier on the phone sometime between August, when Sabrina's baby was born, and when the murders occurred. Greger testified Sabrina Zephier told her that Kalmio beat her with a belt. She testified Sabrina Zephier said she was looking for an apartment with a security door because Kalmio could get into her house. Kalmio did not object to Rochelle Greger's testimony except for the general standing objection he made at the motion in limine hearing to hearsay testimony. The testimony offered by Gregor concerning Sabrina Zephier's physical altercations with Kalmio and her desire to relocate to a safer building could be at least minimally relevant to the issues of Kalmio's motive or intent. *See Tokars*, 95 F.3d at 1535; *Joe*, 8 F.3d at 1492–93; *Fulminante*, 193 Ariz. at 498, 975 P.2d 75. Therefore, the district court did not abuse its discretion in admitting the testimony.

### Joyce Tacan

[¶ 28] Joyce Tacan, a friend of Sabrina Zephier, testified she talked to Sabrina Zephier the day before the murders. They discussed Sabrina Zephier's fear of Kalmio because of the abuse she experienced. The district court allowed her testimony about bruises she saw around Sabrina Zephier's eyes and about the arguments Sabrina Zephier and Kalmio had about taxes. The district court required that Tacan meet the contemporaneousness and relevance to an issue in the case requirements of *Schumacker*.

[¶ 29] Tacan testified to seeing bruises on Sabrina Zephier early in her pregnancy. She also testified that Sabrina Zephier talked about a tax dispute and that Sabrina Zephier told Tacan she wanted her mother to claim her baby. Tacan testified that the day before she was murdered, Sabrina Zephier asked Tacan to stay the night because she feared Kalmio would come over. Kalmio did not object to Tacan's testimony except for the standing objection he made to the hearsay testimony stemming from the witnesses in the motion in limine hearing. Tacan's testimony indicated Sabrina Zephier feared Kalmio and he beat her. The testimony of-

fered by Tacan about Sabrina Zephier's fear of Kalmio and about Sabrina Zephier's injuries at his hands could be at least minimally relevant to the issues of motive or intent. *See Tokars,* 95 F.3d at 1535; *Joe,* 8 F.3d at 1492–93; *Fulminante,* 193 Ariz. at 498, 975 P.2d 75. The district court did not abuse its discretion in admitting the testimony.

### Amy Dauphinais

[¶ 30] Amy Dauphinais, Jolene Zephier's boss, testified at the motion in limine hearing that three or four days before the murders, Jolene Zephier expressed fear for Sabrina Zephier's safety. It was Dauphinais's understanding that Jolene Zephier's fear had to do with an argument between Sabrina Zephier and Kalmio about taxes. The district court ruled Dauphinais could testify at trial to the same things she testified to at the hearing, subject to meeting *Schumacker's* contemporaneousness and relevance requirements. At trial, Dauphinais testified to the same effect, including that she was worried what would happen when Kalmio found out she claimed Kalmio's and Sabrina Zephier's child on her tax return. Kalmio did not object to her testimony, save the standing objection to hearsay testimony. The testimony offered by Dauphinais regarding Jolene Zephier's fear and Sabrina Zephier's disagreement with Kalmio over taxes are at least minimally relevant to Kalmio's motive of intent. *See Tokars,* 95 F.3d at 1535; *Joe,* 8 F.3d at 1492–93; *Fulminante,* 193 Ariz. at 498, 975 P.2d 75. The district court did not abuse its discretion in admitting the testimony.

### Gloria Carbajal

[¶ 31] Gloria Carbajal, a longtime friend of Jolene Zephier, testified at the motion in limine hearing that she occasionally helped Jolene Zephier financially. Carbajal testified Jolene Zephier feared for her children because Kalmio beat Sabrina Zephier with a belt buckle. She further testified that Kalmio knew of Jolene Zephier's plan to talk to a probation officer and that he threatened to come after her and her family if she made problems for him. Carbajal testified Jolene Zephier intended to claim Kalmio and Sabrina Zephier's daughter on her tax return. The district court allowed the double hearsay under Rule 805, N.D.R.Ev., because the statements made by Kalmio to Jolene Zephier showed Kalmio's intent, plan, or motive and the statements made by Jolene Zephier to Carbajal showed Jolene Zephier's state of mind of fear.

[¶ 32] At trial, Carbajal testified to occasionally lending money to Jolene Zephier. She also testified Jolene Zephier feared for her life because Jolene Zephier told her that during an argument with Kalmio after he beat Sabrina Zephier, she told Kalmio that if he continued to beat Sabrina Zephier, she would contact his parole officer, and that Kalmio then threatened to kill Jolene Zephier and her entire family. Carbajal further testified Jolene Zephier had a tax return dispute involving Kalmio because she planned to claim Sabrina Zephiers and Kalmio's child, but Kalmio gave her the wrong social security number for the child. Kalmio did not object to Carbajal's trial testimony, save the standing objection. Carbajal's testimony regarding Jolene Zephier's statements demonstrated Kalmio's plan if Jolene Zephier reported him. Carbajal's testimony regarding Jolene Zephier's statements also is evidence of Jolene Zephier's fear and was at least minimally relevant to Kalmio's motive or intent because she told him that she would report him to his parole officer. *See Tokars,* 95 F.3d at 1535; *Joe,* 8 F.3d at 1492–93; *Fulminante,* 193 Ariz. at 498, 975 P.2d 75. The district court did not abuse its discre-

tion in admitting the testimony from Gloria Carbajal.

### Kenzie Goodhouse

[¶ 33] Kenzie Goodhouse has a child with Kalmio and testified about an incident in which Kalmio took their child to Minot without her permission. The State offered Goodhouse's testimony as a prior bad act for the limited purpose of showing Kalmio's motive, intent and plan to take the child in common with Sabrina Zephier from her home. Because Kalmio waived his prior bad acts arguments by not briefing the issue, we do not address the admissibility of Goodhouse's testimony.

### Natasha Hunts Along

[¶ 34] Natasha Hunts Along, a friend of Sabrina Zephier since 2009, testified about Sabrina Zephier's bruises and about an incident that occurred when Sabrina attempted to move in with her. During the incident, she witnessed Kalmio pull Sabrina Zephier by the arm while she was crying. Hunts Along testified that Kalmio intended to take his and Sabrina Zephier's child to Minnesota, but that Sabrina Zephier did not want that to happen. Hunts Along testified that she planned to watch Sabrina Zephier's child the weekend after she was murdered and that Sabrina told her if Kalmio tried to take the child, Hunts Along should not allow him to do so. The State offered Hunts Along's testimony to show Kalmio's motive, intent and plan to take the child in common with Sabrina Zephier to Minnesota based on his past act of taking his child from Kenzie Goodhouse without Goodhouse's consent. Because Kalmio waived his prior bad acts arguments on appeal, we do not further address Natasha Hunts Along's testimony.

### Elizabeth Lambert

[¶ 35] Elizabeth Lambert, a close friend of Sabrina Zephier, lived with Sabrina Zephier starting after Christmas 2010, until Sabrina Zephier's murder.

The district court allowed Lambert's testimony about the reason Sabrina Zephier requested Lambert to stay with her because Lambert's testimony met the *Schumacker* requirements. Lambert was allowed to testify about her interaction with Kalmio when he was at their apartment, as well as about her knowledge of the methods used by Sabrina Zephier, Kalmio and her to gain entry into the apartment.

[¶ 36] At trial, Lambert testified Sabrina Zephier asked her to move in because she feared Kalmio. Kalmio objected to this testimony, and the district court adhered to its previous ruling. Lambert testified about how she and Sabrina Zephier entered the apartment using ID cards on the lock because only Kalmio had a key. Lambert testified that the first time Kalmio came to the apartment while she was living there, Sabrina Zephier seemed afraid of Kalmio, which Lambert said she knew both because Sabrina Zephier told her she was fearful in the past and because of her demeanor at the time. Kalmio objected, and the district court instructed the jury to disregard Lambert's testimony about Sabrina Zephier's fear of Kalmio. Although unclear from the trial transcript, it appears the district court excluded only the testimony about Sabrina Zephier's fear the first time Kalmio came to the apartment, rather than the earlier proffered testimony regarding the reason Sabrina Zephier wanted Lambert to move in. Lambert also testified to several threats she heard Kalmio make to Sabrina Zephier, including beating her up, hitting her over the head with a bottle and leaving her for dead with the garbage.

[¶ 37] The testimony offered by Lambert regarding Sabrina Zephier asking her to move in because she feared Kalmio could be at least minimally relevant to Kalmio's motive or intent. *See Tokars,* 95 F.3d at 1535; *Joe,* 8 F.3d at 1492–93;

*Fulminante,* 193 Ariz. at 498, 975 P.2d 75. Further, the district court limited the testimony it believed did not fit that purpose. The district court did not abuse its discretion in admitting testimony from Lambert.

[¶ 38] We conclude that in evaluating the admissibility of each witness's testimony, the district court did not act arbitrarily, capriciously, or unreasonably, nor did it misinterpret or misapply the law. The district court did not abuse its discretion. We affirm the district court's determination of the admissibility of each witness's testimony.

### III

[¶ 39] Kalmio argues the district court abused its discretion in refusing to give an alibi jury instruction.

[¶ 40] Rule 12.1(a), N.D.R.Crim.P., requires that "[a] defendant who intends to offer an alibi defense must serve written notice on the prosecuting attorney of any intended alibi defense and file the notice within the time provided for the making of pretrial motions...."

"A district court's decision to exclude evidence of an alibi under N.D.R.Crim.P. 12.1 is reviewable under the abuse of discretion standard. A court abuses its discretion if it acts unreasonably, arbitrarily, or capriciously, or if it misinterprets or misapplies the law. When determining whether to allow alibi evidence when the notice requirements of Rule 12.1 have not been met, 'a court ought to take into account, among other particulars of the case, the actual prejudice that will redound to the prosecution if the testimony is allowed and whether the defendant's failure to inform was in good faith and for good cause.'"

*State v. Sevigny,* 2006 ND 211, ¶ 12, 722 N.W.2d 515 (citations omitted).

[¶ 41] "An alibi is a recognized, valid defense in this State." *State v. Olmstead,* 261 N.W.2d 880, 885 (N.D.1978). "A 'defense' is raised when there is evidence in the case 'sufficient to raise a reasonable doubt on the issue.'" *State v. Thiel,* 411 N.W.2d 66, 67 (N.D.1987) (quoting N.D.C.C. § 12.1–01–03(2)(b)). In *Thiel,* an assault case, we held Thiel was entitled to his requested jury instruction because evidence was presented sufficient to raise a reasonable doubt on whether he was justified in using force under self-defense and defense of others. 411 N.W.2d at 69. We further held it was a well-established rule "that a defendant is entitled to have submitted to the jury, with proper instructions, all defenses of which there is any support in the evidence, whether such defenses are consistent or inconsistent." *Id.* at 68–69 (quoting *State v. Hazlett,* 16 N.D. 426, 432, 113 N.W. 374, 376 (1907)) (citing *see, e.g., Womack v. United States,* 336 F.2d 959 (D.C.Cir.1964) ("[A] defendant is entitled to an instruction on any issue fairly raised by the evidence, whether or not consistent with the defendant's testimony or the defense trial theory.")). This Court, however, recognizes the ease with which an alibi may be fabricated and the importance of raising the defense before the trial to ensure the alibi will be accorded due respect. *See State v. Flohr,* 301 N.W.2d 367, 371–72 (N.D.1980) ("Rule 12.1 certainly does not represent an unconditional restriction on a defendant's ability to make out his case. The defendant is forbidden nothing, but is required only to proceed in a certain manner."). Rule 12.1 was amended to require the initial burden be placed on the defendant to raise the defense of alibi, which is done by serving written notice on the prosecuting attorney within the specified time, including the specific places and names of alibi witnesses. N.D.R.Crim.P. 12.1 Explanatory Note. The explanatory note

warns that failure to comply with the notice requirements could result in the exclusion of testimony on the issue. *Id.*

[¶ 42] Kalmio did not file a notice of alibi defense as required by Rule 12.1. Kalmio argues he was not required to present testimony that he was not in Minot because the State presented testimonial evidence that Kalmio claimed to be at the oil rigs near Williston at the time of the murders. The district court considered the particulars of this case and determined Kalmio had information from a discovery interview allowing him to make an alibi argument. Further, the district court was persuaded that because Kalmio had the pretrial motion deadline extended, he had ample time to formulate his alibi argument. For those reasons, the district court determined insufficient good cause existed to allow the alibi instruction.

[¶ 43] Kalmio did not raise his alibi defense as required by Rule 12.1, despite ample time and available information to formulate the argument. While the State presented Kalmio's bare assertions he was at the oil rigs near Williston at the time of the murders, without more those assertions are not sufficient evidence to raise a reasonable doubt on the issue. We conclude the district court did not abuse its discretion in refusing to give an alibi jury instruction.

### IV

[¶ 44] Kalmio argues the State engaged in prosecutorial misconduct during its closing argument by showing slides depicting material intended to stir passions of the jury, resulting in contamination of the entire proceeding.

[¶ 45] We apply a de novo standard of review "to whether facts rise to the level of a constitutional violation, including a claim that prosecutorial misconduct denied a defendant's due process

right to a fair trial." *State v. Pena Garcia*, 2012 ND 11, ¶ 6, 812 N.W.2d 328.

"[P]rosecutorial misconduct may so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process. However, we have also recognized that not every assertion of prosecutorial misconduct, followed by an argument the conduct denied the defendant his constitutional right to a fair trial, automatically rises to an error of constitutional dimension. To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. To determine whether a prosecutor's misconduct rises to a level of a due process violation, we decide if the conduct, in the context of the entire trial, was sufficiently prejudicial to violate a defendant's due process rights."

*Id.* (quoting *State v. Duncan*, 2011 ND 85, ¶ 12, 796 N.W.2d 672). We must consider whether the prosecutor's actions constitute misconduct and, if so, whether the misconduct had a prejudicial effect and would affect the jury's ability to fairly judge the evidence. *Pena Garcia*, at ¶ 6. "'Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.'" *Id.* (citation omitted).

[¶ 46] Kalmio argues the State improperly used PowerPoint images that were not in evidence, including images of a gun and red circles he claimed resembled blood. Kalmio objected to the slides. The district court sustained the objection, directing images of the gun and the red circles be removed and admonishing the jury to disregard the images. "Claims of improper argument are generally not grounds for reversal because it is pre-

sumed the jury will follow the trial court's admonition and disregard improper statements." *Pena Garcia*, 2012 ND 11, ¶ 10, 812 N.W.2d 328. The judge also instructed the jury that any comments or statements by counsel concerning the evidence which are not supported by the evidence should be disregarded and the jury member should rely on their own recollection or observation. *Id.* (concluding jury instructions directing the jury to disregard statements by counsel that are not supported by the law prevented possible prejudice).

[¶ 47] Without the images in the record, we are unable to conclude use of the images was misconduct. Even assuming without deciding there was misconduct, the prosecutor's attempt to use two images during closing argument was not sufficiently prejudicial to violate Kalmio's due process rights because the district court directed the images to be removed and the jury to disregard the images. We presume the jury follows such instructions. We conclude the district court did not violate Kalmio's due process rights by directing the jury to disregard the removed images, rather than by ordering a mistrial based on prosecutorial misconduct.

V

[¶ 48] Kalmio argues the evidence was insufficient to support his conviction.

[¶ 49] This Court is clear on its standard of review when the sufficiency of the evidence is challenged:

" 'Appellate review of the sufficiency of the evidence for a jury verdict is very limited. When the sufficiency of evidence to support a criminal conviction is challenged, this Court merely reviews the record to determine if there is competent evidence allowing the jury to draw an inference reasonably tending to prove guilt and fairly warranting a con-

viction. The defendant bears the burden of showing the evidence reveals no reasonable inference of guilt when viewed in the light most favorable to the verdict. When considering insufficiency of the evidence, we will not reweigh conflicting evidence or judge the credibility of witnesses. . . . A jury may find a defendant guilty even though evidence exists which, if believed, could lead to a verdict of not guilty.' "

*State v. Zottnick*, 2011 ND 84, ¶ 14, 796 N.W.2d 666 (citation omitted). "A verdict based upon circumstantial evidence carries the same presumption of correctness as other verdicts and will not be disturbed on appeal unless the verdict is unwarranted." *State v. Olson*, 290 N.W.2d 664, 670 (N.D. 1980). "Circumstantial evidence alone may justify a conviction if it is of such probative force as to enable the trier of fact to say that the defendant is guilty beyond a reasonable doubt." *Id.* at 670–71.

[¶ 50] Kalmio rests his sufficiency of the evidence challenge on the largely circumstantial evidence supporting his conviction. Ample testimony established Kalmio had a volatile relationship with Sabrina Zephier and her family. Testimony existed of a dispute over who would claim Kalmio and Sabrina Zephier's daughter on their tax returns and who would have custody of the child. Although no direct evidence established Kalmio was in Minot the night of the murder, testimony revealed Kalmio was seen getting into a white truck resembling the one seen outside Sabrina Zephier's apartment the night of the murder. Further, Kalmio had keys to Sabrina Zephier's apartment, and no evidence of forced entry into her apartment existed.

[¶ 51] Competent evidence existed allowing the jury to draw an inference rea-

sonably tending to prove Kalmio's guilt and fairly warranting his conviction.

## VI

[¶ 52] We conclude the district court did not abuse its discretion in allowing hearsay testimony at trial, in denying his request for an alibi jury instruction and in denying Kalmio's motion for a mistrial on the grounds of prosecutorial misconduct. Sufficient evidence exists to support the guilty verdicts. We affirm the district court judgments entered after a jury found him guilty of four counts of class AA felony murder.

[¶ 53]GERALD W. VANDE WALLE, C.J., and DALE V. SANDSTROM, JJ., concur.

[¶ 54] The Honorable Lisa Fair McEvers was not a member of the Court when this case was heard and did not participate in this decision. The Honorable Mary Muehlen Maring, S.J., sitting.

KAPSNER, Justice, dissenting.

[¶ 55] I respectfully dissent from parts II, V, and VI of the majority opinion.

## I

[¶ 56] At trial, the State offered the testimony of several witnesses, who recounted conversations they allegedly had with Sabrina Zephier or Jolene Zephier. The admissibility of each witness's testimony was analyzed by the district court prior to trial under either the hearsay or prior bad acts exceptions, and Kalmio's appeal focuses only on the district court's hearsay analysis.

[¶ 57] The North Dakota Rules of Evidence prohibit the admission of hearsay— out of court statements offered to prove the truth of the matter asserted—unless the statements meet one of the enumerated exceptions. N.D.R.Ev. 801; 802. In its pretrial order, the district court relied exclusively on the exception to the rule against hearsay found in Rule 803, N.D.R.Ev., which is based on the federal rule and allows statements concerning a declarant's then-existing state of mind. *See* N.D.R.Ev. 803(3) and Explanatory Note. The exception for hearsay statements concerning a declarant's state of mind arose out of the increased trustworthiness of such statements "due to their spontaneous nature." Jay M. Zitter, Annotation, *Admissibility of evidence of declarant's then-existing mental, emotional, or physical condition, under Rule 803(3) of Uniform Rules of Evidence and similar formulations*, 57 A.L.R.5th 141, 141 (1998).

[¶ 58] This Court has held that, "For a statement to be admissible under the state of mind or emotion exception to the hearsay rule, the declarant's statement must be contemporaneous with the mental or emotional state sought to be proven, there must be no circumstances suggesting a motive for the declarant to misrepresent his or her state of mind, and the declarant's state of mind must be relevant to an issue in the case." *Schumacker v. Schumacker*, 2011 ND 75, ¶ 15, 796 N.W.2d 636 (citing Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.05[2] (2nd ed.2011)). It is the last of these three requirements—that the declarant's state of mind be relevant to an issue in the case—that is the basis for my dissent.

[¶ 59] This third portion of our state-of-mind exception is broader than Minnesota's version of the rule, which Kalmio urged this Court and the district court to adopt. Under Minnesota's rule, evidence of the type at issue in this case is admissible only if the victim's state of mind is "a relevant issue" in the case. *See Bernhardt v. State*, 684 N.W.2d 465, 474 (Minn.2004). Thus, Minnesota limits the use of this type

of testimony to cases where the defendant raises the defense of accident, suicide, or self-defense. *Id.* The district court and the majority declined to adopt this stricter standard for the admission of state-of-mind evidence, and I do not take issue with that rejection. However, I believe the district court erred and the majority's analysis is flawed, even under our own, more lenient, standard.

[¶ 60] One important additional caveat to the state-of-mind exception is that the statements admitted cannot be used to prove the truth of the underlying facts. *See Schumacker,* 2011 ND 75, ¶ 15, 796 N.W.2d 636.

> The state-of-mind exception generally excludes a statement of memory or belief to prove the fact remembered or believed.... The hearsay rule would effectively be destroyed if statements indicating a state of mind were admissible to infer the happening of the event which produced the state of mind; consequently, such statements are inadmissible. It has also been held that the state-of[-]mind exception allows only for the admission of statements showing the declarant's state of mind, not statements explaining the declarant's state of mind.

31A C.J.S. *Evidence* § 452 (2008) (footnotes omitted). "The exclusion of 'statements of memory or belief to prove the fact remembered or believed' is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind." Fed. R.Evid. 803, 1972 Advisory Committee Notes (citations omitted).

## II

[¶ 61] Terri Zephier's 803(3) testimony consisted of the introduction of a Decem-

ber 20, 2010 Facebook message from Sabrina Zephier to Terri Zephier, which stated:

> Terri, I need you to come get me ASAP. Don't call because if Omar knows you are calling he will get mad and start hitting me again. My face is fucked up, Terri. Come up here and key the door. But I need you, please, my face is fucked up and my body, please. ASAP when you read this. But if you call he will start hitting me again. Please just come up here, you and mom come, 'kay, he is crazy.

[¶ 62] Amy Dauphinais's 803(3) testimony was:

Q Do you recall at any time Jolene making any mention to you about Sabrina's safety?

A Yes.

Q And do you recall approximately when that was?

A I would say probably a year prior to her death, I would say. Several times throughout that year.

Q And did she make any reference to who she was in fear of?

A Sabrina or Jolene?

Q Jolene?

A Omar.

Q Did she ever tell you anything about a tax return argument?

A Absolutely.

Q Do you recall when that took place?

A It was approximately three or four days prior to her murder.

Q And what was this dispute about as told by Jolene?

A Jolene was worried what was going to happen when Omar found out that she had claimed Sabrina and the baby on her tax return.

[¶ 63] Ashley Counts' 803(3) testimony concerned a meeting between her and Sa-

brina Zephier on December 22, 2010 at the Domestic Violence Crisis Center:

Q What was the purpose of this meeting?

A The purpose of this meeting was to meet with Sabrina, visit with her about an altercation that occurred the day before between her and her ex-boyfriend.

Q Did you witness any injuries to Sabrina?

A Yes.

Q Where?

A She a black eye and scratches on her back.

Q Did you take photographs?

A I did not.

Q Why?

A I don't remember.

Q Did she make any mention—or excuse me. Did you make any advisement to her on taking any further action?

A We did discuss options that we could help her with including our safe home, protection order, and then, of course, safety planning.

Q Do you recall being present with Sabrina and if she filled out an assessment form?

A Yes.

Q And you were present during that assessment?

A Yes.

Q Is a copy of that assessment provided to law enforcement and the state's attorney's office?

A Yes.

Q I have handed to you what's been marked as State's Exhibit 127. Could you please identify that document?

A That document is the assessment that Sabrina and I did that evening.

Q And you were present during that assessment?

A Yes.

Q Do you recall this assessment?

A Yes.

. . . .

Q And if you could, there is some questions that are laid out on this assessment, correct?

A Yes.

Q And do you see how many questions are on there?

A Yes. There are 22.

Q And who is it that makes the notes on this assessment?

A This assessment is done by the client and so the client would be the one that fills it out.

Q And if you would be able to can you indicate her responses on each of the questions?

A Yes.

Q And going through Question 1 are you able to read that?

A Yes.

Q Could you read that and indicate her response?

A Do you fear for your life or, if applicable, for your children's lives? No.

Q Question 2?

A Threats of homicide or suicide by the abuser? Originally marked yes, scratched off and wrote no. I had her initial that so we knew that that was her change.

Q Question 3?

A Fantasies of homicide or suicide by abuser? No.

Q Question 4?

A The abuser seems depressed? Yes.

. . . .

Q   Do you recall Sabrina's demeanor during this meeting?

A Yes.

Q   What was that?

. . . .

A Her demeanor coming in was sad, upset, and afraid.

Q   And did you speak to her about a possible course of action?

A Yes.

Q   What was that?

A We discussed going through paperwork to obtain a protection order.

Q   And what were the plans in regards to obtaining a protection order?

A The plans regarding that would be to fill out paperwork at the office, I would type it into the computer, and then they would bring it to the judge to look at at a later time.

Q   Did you ever discuss with Sabrina about contacting law enforcement?

A Yes.

Q   And did she indicate if she would agree to that?

A She would not.

Q   Did Sabrina make any mention about her child?

A Yes.

[¶ 64]   Gloria Carbajal's 803(3) testimony concerned a conversation she had with Jolene Zephier in October 2010:

Q   Jolene ever make any threats known to you involving the Defendant?

A Just that she was afraid for her life.

Q   So what did she tell you?

A That the guy had threatened her if she had—

Q   If I may.  Just one moment before you answer that, Miss Carbajal.  I am sorry, Miss Carbajal.  First would you indicate who this guy is?

A Omar.

Q   What was it that Jolene had told you?

A They had an argument because he had been beating her daughter.  And she told him if he continued to do that that she was going to go to their parole officer and turn him in.

. . . .

Q   Did she ever talk about a tax return dispute involving the Defendant?

A Yes.

Q   Do you know what that was about?

A Jolene claimed his daughter for taxes.  And he had gave her the wrong social security number and she had confronted him on it.  And she was getting a large tax refund back.

Q   And to your knowledge did this involve the Defendant's daughter?

A Yes.

Q   That he shared with Sabrina?

A Uh-huh.

Q   Did she ever mention a specific threat?

A He told her that if she told on him that he would kill her and her whole family.

[¶ 65]   Rochelle Greger's 803(3) testimony concerned two phone conversations she had with Sabrina Zephier, one occurring around August 2010 and one occurring in late December 2010 or early January 2011:

Q   And what was it that was discussed about this—Well first of all, do you recall the basis of the phone call?

A She called me and told me that Omar had been beating her and he beat her with a belt.

Q   And did she tell you where she was at that time when she made this call?

A I think she was at her mom's.

Q   How did she sound on the phone?

A Sad to have to tell me that.

Q Did she indicate any injuries that she had?

A Yeah. Her butt was pretty bruised and welted.

Q Did she tell you how it felt?

A No, I don't think so.

. . . .

Q I mean as far as, did you have any further phone conversations with Sabrina after this one we are talking about? Not in person, but phone conversations?

A I can't even think. I don't know right now.

Q Do you recall Sabrina ever talking to you about trying to find a different place to live?

A Oh, yes.

Q What was it that she told you about that?

A She said she was looking at an apartment that had security doors.

Q Did she say why she was looking for security?

A Because Omar was able to get into her house.

[¶ 66] Joyce Tacan's 803(3) testimony described a conversation she had with Sabrina Zephier the day before she died:

Q Did she make any special requests to you that night?

A She just asked if I could stay the night with her.

Q And on your understanding where were you supposed to spend the night?

A At her house.

Q Are you talking about her apartment at South Main?

A Yeah.

Q Did she say why she wanted you to spend the night?

A Because she didn't want to be alone.

Q Did she say anything more about why she was going to be alone?

A She was scared that Omar would come over there.

Q Did she make any mention of her roommate at the time?

A No.

[¶ 67] Elizabeth Lambert's only Rule 803(3) testimony was "S[abrina] didn't want to be there alone. She was scared of Omar. And she wasn't with him no more." The district court admitted this evidence to show why Sabrina Zephier asked Lambert to stay with her.

III

[¶ 68] In its pretrial order, the district court noted that "[i]n the case at bar, a specific state of mind, fear, is attempted to be shown by the State to demonstrate the state of mind of Sabrina and Jolene in the time period before their murders." The district court analyzed the evidence at issue under North Dakota's state-of-mind exception to the hearsay rule, allowing state-of-mind evidence when the declarant's state of mind is "relevant to an issue in the case." The court then determined that, with respect to the statements allegedly made by Sabrina Zephier to Ashley Counts, "Sabrina's fear is relevant *to demonstrate why she took certain actions relevant to the case.*" (Emphasis added). With respect to similar hearsay evidence from Terri Zephier, Joyce Tacan, and Amy Dauphanais, the court repeatedly held such evidence would be admissible "[d]epending upon the State's ability to meet the *Schumacker* test with regard to contemporaneousness and relevance to an issue in the case. . . ." The court would not rule on the admissibility of Rochelle Greger's hearsay testimony in its pretrial order. The court ruled the statements made by Jolene Zephier to Gloria Carbajal were

relevant to show Jolene Zephier's fear, but did not indicate how this fear was relevant to an issue in the case. In a subsequent order, the court ruled Sabrina Zephier's statements to Elizabeth Lambert were "relevant to the issue of the reasons behind her request to Lambert to stay with her." At trial, Kalmio asserted and was granted a standing objection to this evidence, and the district court gave no further explanation for its admission. The district court never ruled on the admissibility of Rochelle Greger's testimony.

[¶ 69] The district court appears to have been operating under the assumption that the challenged testimony was admissible because Sabrina and Jolene Zephier's fear was relevant to show why they did what they did before their deaths. But why Sabrina and Jolene Zephier took certain actions is of no relevance to any issue in this case, aside from perhaps adding context to the story. To admit the evidence for that purpose, the judge would have been required to weigh the evidence under N.D.R.Ev. 403, limit the testimony to exclude extraneous facts, and give the jury a limiting instruction that the information was not to be taken as true, which he did not do. *See State v. Carlson*, 1997 ND 7, ¶¶ 5–9, 559 N.W.2d 802. Kalmio was charged with "intentionally or knowingly caus[ing] the death of another human being," under N.D.C.C. § 12.1–16–01. It is primarily the actions, intentions, and purpose of Kalmio that are relevant. Thus, the district court's admission of hearsay evidence—through the testimony of Counts, Terri Zephier, Greger, Tacan, Dauphinais, Carbajal, and Lambert—under the state-of-mind exception on the basis that such evidence was relevant to demonstrate why Sabrina and Jolene Zephier took certain actions, was erroneous.

IV

[¶ 70] The majority opinion suggests, for the first time in this case, that Sabrina and Jolene Zephier's fear was relevant because it served as the motive for Kalmio to murder them. The majority relies on this theory as a basis for admitting the testimony of Counts, Terri Zephier, Greger, Tacan, Dauphinais, Carbajal, and Lambert. If this theory were legitimate, then I agree that Sabrina and Jolene Zephier's statements concerning their fear would fall within the exceptions we have set forth in *Schumacker*. However, the majority's proffered explanation of the relevancy of Sabrina and Jolene Zephier's fear is baseless.

Proof that the victim feared the defendant would appear to fall smack within the Rule 803(3) exception and thus be admissible, as many cases have in fact held, since little is more illustrative of a state of mind than the declarant's statements expressing emotions such as fear. Nevertheless, a statement of threats by the defendant and of concomitant fear on the victim's part may be irrelevant to proving the case, such as where there was no allegation that the killing was not the defendant's fault because it was an accident, in self-defense, or a suicide.

Zitter, *supra*, at 178 (citation omitted).

[¶ 71] As discussed above, the underlying facts of Sabrina and Jolene Zephier's statements to the witnesses at issue—facts detailing alleged aggressive behavior by Kalmio—cannot be relied upon for their truth. The statements at issue should be considered only to the extent that they show Sabrina and Jolene Zephier's fear of Kalmio. In deciding whether to admit the statements at issue, the question is whether Sabrina and Jolene Zephier's fear, in and of itself, provided a motive for Kalmio to kill them.

[¶ 72] The majority cites *Schumacker* as an analogous case. 2011 ND 75, 796

N.W.2d 636. *Schumacker* involved a motion to modify custody of the parties' two children. *Id.* at ¶ 1. In support of his motion, the father offered an affidavit of the children which contained allegations of domestic violence in the mother's home. *Id.* at ¶ 13. This Court found the statements admissible under the Rule 803(3) state-of-mind exception to the rule against hearsay, because they "provide[d] competent evidence on how the children were affected by incidents occurring in their home." *Id.* at ¶ 16. As the court noted "[a] material change of circumstances can occur if a child's present environment may endanger the child's ... emotional health or impair the child's emotional development." *Id.* at ¶ 14 (citation omitted). Thus, the children's emotional state was directly at issue in that case. *Cf. State v. Gray,* 129 Idaho 784, 932 P.2d 907, 918 (Idaho Ct.App.1997) (holding the victim's state of mind of fear was not relevant because her statement that she feared her ex-boyfriend did not show that he possessed an intent to harm her); *State v. Downey,* 206 N.J.Super. 382, 502 A.2d 1171, 1176 (N.J.Super.Ct.App.Div.1986) (holding the state of mind of the victim was not relevant in a murder case).

[¶ 73] In *United States v. Tokars,* which the majority also cites, the court allowed evidence concerning the defendant's wife's intent to divorce the defendant under the Fed.R.Evid. 803(3) state-of-mind exception. 95 F.3d 1520, 1535 (11th Cir.1996). In that case, the defendant, Fredric Tokars, was charged with murder-for-hire, for hiring a man, Lawrence, to murder his wife, Sara Tokars. *Id.* at 1527–28. The court concluded that evidence of Sara's state of mind was relevant to the defendant's motive to kill her in that case, because "Tokars knew of the change in Sara's state of mind when he asked Lawrence to kill her. The fact that she wanted to divorce him and take all of his

money is what apparently prompted him to have her killed." *Id.* at 1535. Tokars told Lawrence that Sara's desire to divorce him was his motive for the murder, and Lawrence testified at Tokars' trial. *Id.* at 1528, 1535.

[¶ 74] In this case, not once did the State argue, nor the district court find, that Sabrina Zephier or Jolene Zephier's fear, as expressed to the witnesses, was relevant to Kalmio's alleged motive for the murders. There was never any suggestion that Kalmio killed Sabrina and Jolene Zephier because of their fear of him or because others knew of their fear. Similarly, there is no indication that Kalmio knew about the conversations between Sabrina and Jolene Zephier and the witnesses. The lack of evidence in the record to support the majority's theory is undoubtedly the reason the majority opinion contains speculative language: "logically would know ...," "could be relevant ...," "could be at least minimally relevant to the issues of motive or intent." However, it has always been the case that "the circumstances said to have excited the emotion must be shown to have probably become known to the person; because otherwise it could not have affected his emotions." *State v. Potter,* 60 N.D. 183, 233 N.W. 650, 657 (1930) (quoting Wigmore on Evidence, § 389, p. 711).

[¶ 75] Without some basis for the theory that Kalmio killed Sabrina and Jolene Zephier because of their fear, the witnesses' statements about Sabrina and Jolene Zephier's fear are not relevant to an issue in this case. To admit the evidence at issue under the guise of corroborating an otherwise unraised and undocumented motive would allow a court to cast aside the entire hearsay rule any time a crafty attorney could hypothesize the attenuated relevance of hearsay evidence. For this reason, I believe it would be erroneous to

admit the evidence at issue under the majority's reasoning.

## V

[¶ 76] Even if there was support for the theory that Kalmio killed Sabrina and Jolene Zephier because of their fear and the fact that they expressed this fear to other people, the district court's admission of additional testimony regarding the alleged incidents of physical and verbal confrontation between Kalmio and Sabrina and Jolene Zephier which led to their fear exceeded the scope of Rule 803(3)'s state-of-mind exception.

> [W]here the victim is no longer available, such as in a murder prosecution, the statements of the victim take on critical importance, since they may be the only recordings of the victim's thoughts, and since they may shed light on the entire criminal episode. Yet, it is to be stressed that the single most important factor concerning the admissibility of victims' statements under Rule 803(3) is whether the statements are illustrations of the victims' thoughts at the time they were made or whether, even at such time, the statements were inadmissible as dealing with memories of preceding events or feelings.
>
> ... [A] statement of threats by the defendant and of concomitant fear on the victim's part ... may reflect more on past incidents involving the defendant and less on the reaction of the victim— that is, fear—so that the statement may prove a fact remembered or believed by the declarant and will not be evidence of a state of mind. Thus, ... courts have found such statements to be inadmissible hearsay despite Rule 803(3).

Zitter, *supra*, at 178–79 (citation omitted).

[¶ 77] As previously noted, statements admitted under the state-of-mind exception to the rule against hearsay cannot be used to prove the truth of the underlying facts. *See Schumacker*, 2011 ND 75, ¶ 15, 796 N.W.2d 636.

[¶ 78] To the extent that this Court has previously found hearsay statements to be admissible under the state-of-mind exception, these admissions have excluded extraneous details about the alleged facts that led to the state of mind. In *Schumacker*, this Court noted: "Inadmissible hearsay statements are not competent evidence. Some of the statements in Schumacker's affidavit rely on what he was told by the parties' children and Blair's mother and are inadmissible hearsay." *Schumacker*, 2011 ND 75, ¶ 15, 796 N.W.2d 636. This Court held only the statements "The children told me what had happened, and about the fight" and "The children could hear everything and A.D.S. was crying" were admissible under the state-of-mind exception to the hearsay rule. *Id.* at ¶ 16. Although the affidavit at issue contained more information regarding the alleged incident of domestic violence, this Court did not include these extraneous facts in its Rule 803(3) holding.

[¶ 79] Similarly, in *State v. Fulminante*, on which the majority relies, the Supreme Court of Arizona held a victim's state of mind may be relevant to prove the defendant's motive, but statements of memory or belief are not admissible under the state-of-mind exception. 193 Ariz. 485, 975 P.2d 75, 87–88 (1999). The Court held that the victim's dislike and fear of her stepfather were permitted under the rule. *Id.* However, the court found that the statements "He's going to kill me" and "I'm afraid he's going to kill me" were inadmissible because they were statements of belief about the defendant's future conduct. *Id.* at 88. The court also found a statement which reported a conversation the victim overheard between her stepfather and mother was inadmissible because

it was a statement of memory. *Id.; see also Capano v. State*, 781 A.2d 556, 609 (Del.2001) (differentiating, under the state-of-mind exception to the rule against hearsay, between the admissible statement "I am afraid," and the inadmissible statement "I am afraid of D *because he threatened me* "); *United States v. Joe*, 8 F.3d 1488, 1492–93 (10th Cir.1993) (holding the victim's assertion of why she was afraid was a statement of memory or belief and was excluded by the state-of-mind exception to the rule against hearsay).

[¶ 80] The hearsay statements offered through Dauphinais, Tacan, and Lambert's testimony were succinct and dealt only with Sabrina and Jolene Zephier's states of mind. As previously discussed, I do not believe their states of mind were relevant to any issue in this case. However, if they were, I would not dispute the admissibility of these three witnesses' testimony on the grounds that it exceeded the scope of the Rule 803(3) exception.

[¶ 81] On the other hand, the testimony of Counts, Terri Zephier, Greger, and Carbajal go much further than simply explaining Sabrina and Jolene Zephier's states of mind. The statements detail multiple alleged physical and verbal confrontations between Kalmio and Sabrina and Jolene Zephier. It is clear to me that the real value in this testimony is in the witnesses' detailed account of the tumultuous relationships between Kalmio and Sabrina and Jolene Zephier and the inference that Kalmio acted in conformity and killed Sabrina and Jolene Zephier. However, this is precisely the type of information that is not to be relied on under the guise of a state-of-mind exception to the hearsay rule. Thus, even if Sabrina and Jolene Zephier's fear was shown to be relevant to some issue in this case, I believe it was still erroneous for the district court to admit the testimony of Counts, Terri Zephier, Greger, and Carbajal to the extent that it recounted statements by Sabrina and Jolene Zephier about past physical and verbal confrontations between themselves and Kalmio.

[¶ 82] I do not take issue with whatever is left of the testimony of Counts, Terri Zephier, Greger, and Carbajal, because it is first-hand testimony and does not rely on Rule 803(3). The testimony of Kari Salmon, Kenzie Goodhouse, and Natasha Hunts Along was not admitted under Rule 803(3) and was not challenged by Kalmio; therefore, I agree with the majority that this testimony need not be addressed on appeal.

## VI

[¶ 83] "The admissibility of state-of-mind hearsay turns on weighing probative value against the danger of unfair prejudice, confusion of the issues, or misleading the jury." 23 C.J.S. *Criminal Law* § 1179 (Westlaw 2014). In this case, no limiting instruction was ever given to the jury regarding their consideration of the testimony admitted under the state-of-mind exception. As a result, the jury was free to, and likely did, consider these statements as proof that Kalmio had physically and verbally confronted Sabrina and Jolene Zephier in the past. I therefore believe, even if the hearsay evidence had been properly admitted under an exception to the rule against hearsay, admission of this evidence had to be evaluated under the "unfairly prejudicial" criteria of N.D.R.Ev. 403.

## VII

[¶ 84] When a trial court errs in admitting evidence, this Court must determine "whether the error was so prejudicial that a defendant's substantial rights were affected and a different decision would have resulted without the error." *State v. Kelly*, 2001 ND 135, ¶ 26, 631 N.W.2d 167.

"To determine whether error affecting substantial rights of the defendant has been committed, the entire record must be considered and the probable effect of the error determined in the light of all the evidence." N.D.R.Crim.P. 52, Explanatory Note. If the error was harmless, it will be disregarded. *See Kelly,* 2001 ND 135, ¶ 26, 631 N.W.2d 167. However, if the error was not harmless, we will reverse the judgment. *See State v. Doppler,* 2013 ND 54, ¶ 26, 828 N.W.2d 502; *State v. Aabrekke,* 2011 ND 131, ¶ 16, 800 N.W.2d 284.

[¶ 85] As the State itself noted in its supporting brief before the district court, the State's case was based largely on circumstantial evidence. No physical evidence tied Kalmio to the crime scene, no witnesses observed him there, and no murder weapon was ever recovered. Although the State appears to have been attempting to establish a history of domestic abuse between Kalmio and Sabrina Zephier, none of the witnesses directly observed violence. Because of the circumstantial nature of the evidence presented at trial and the pervasiveness of the district court's error, I do not believe the error in admitting testimony can be considered harmless.

## VIII

[¶ 86] Because I believe the district court committed prejudicial error in the admission of hearsay evidence under the state-of-mind exception to the hearsay rule, I would reverse the judgments of conviction and remand this case to the district court for a new trial. I note that, on remand, nothing would prohibit the district court from analyzing or admitting the statements at issue, and even their underlying facts, under a different exception to the hearsay rule or as nonhearsay, if applicable.

[¶ 87] MARY MUEHLEN MARING, S.J., concurs.